**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Richard BAUM and Joseph Scapoli, Defendants-Appellants.**

**Nos. 370, 468, Docket 72–1966, 72–2134.**

United States Court of Appeals, Second Circuit.

Argued Jan. 3, 1973.

Decided March 22, 1973.

As Amended on Denial of Rehearing June 4, 1973.

Michael B. Mukasey, Peter L. Truebner, John W. Nields, Jr., Asst. U. S. Attys., Whitney North Seymour, Jr., U. S. Atty., for appellee.

Arthur S. Olick, Kreindler, Relkin, Olick & Goldberg, New York City, for defendant-appellant Baum.

Irving Anolik, New York City, Lanna, Coppola & Rosato, Yonkers, N. Y., for defendant-appellant Scapoli.

Before FRIENDLY, Chief Judge, FEINBERG, Circuit Judge, and HOLDEN,* District Judge.

HOLDEN, District Judge:

Richard Baum and Joseph Scapoli appeal their conviction, after trial by jury, of criminal possession of Panasonic radios stolen from a foreign and interstate shipment of freight, knowing the same to have been stolen, in violation of 18 U.S.C. § 659. The trial began on July 17, 1972 in the Southern District of New York, Judge MacMahon presiding.

The evidence was completed and the cause submitted on the same day. The jury returned its verdict the following morning, finding the appellants guilty. Their co-defendant Stuart Fields was acquitted.

On November 12, 1971 a ship's container, holding approximately one thousand cartons of Panasonic radios, was stolen from the Hoboken, New Jersey terminal of Smith Transport, an interstate carrier. The container included five different models of radios manufactured in Japan by the Matsushita Electric Company, under the trade name Panasonic and ordered by Leeds Fox, a customer in New Jersey. The models in the ship's container were designated as R–70, R–1241, RC–7021, RE–7670 and RF–951.

Fields and Scapoli were business associates. They operated a radio, tape and record shop known as The Royal Rhythm No. 1 Record Shop, North Main Street, Yonkers, New York. They also operated another store known as The Music Man. Fields and Scapoli were retailers and distributors of Panasonic radios.

About five o'clock in the afternoon of November 12, 1971 an unidentified tractor trailer unit was halted near the front door of the Royal Rhythm store in Yonkers. Keith Lurkens, a government witness at the trial, arrived to pick up his girlfriend, who was employed at the Royal Rhythm. Lurkens was requested by Fields and Scapoli to assist them in unloading "a couple of packages" from the truck. The witness complied and during the next hour aided in the removal of fifty or sixty cartons, bearing the Panasonic seal, from the trailer to the store basement.

During the following week, on November 19, an agent of the Federal Bureau of Investigation observed two men, who were not specifically identified at the trial, arrive at the Royal Rhythm store in Yonkers. They proceeded to remove a number of cartons, bearing three of

* Chief Judge of the District Court for the District of Vermont, sitting by designation.

the model numbers and the Panasonic label, which corresponded with those in the stolen shipment. The boxes were loaded into a small van that was later identified as registered to Jaymie Records. After loading, the truck departed. It was followed by the agent. It proceeded from Yonkers to New York City and traveled on to the residence of one Fernando Gil, 5912 Xenia Street, Queens. The execution of a warranted search of the garage at the Gil premises the following day produced four cartons of radios, model RF–951, six cartons of model RE–7670 and forty-four cartons of model RC–7021.

On the next day the defendant Baum and another man, identified as Sam Bari, also known as Sam Cope, arrived at Royal Rhythm in a bronze Dodge Van. The vehicle was loaded with cartons bearing the name Panasonic, which included forty-five boxes, the model number 7021. Baum was taken into custody at the Royal Rhythm.

At about the same time agents of the Federal Bureau of Investigation executed a search warrant and recovered forty-four Panasonic radios from the Royal Rhythm store. The recovery included nineteen model R–1241, twenty model R–70, one RF–951, two RE–7670 and two model RC–7021. Further down the same street, other radios, which came from the Royal Rhythm store, were recovered.

In a telephone conversation with the defendant Scapoli, following the search of November 20, Special Agent Teel of the F.B.I. inquired about the source of the radios that were uncovered. Scapoli responded: "I won't kid you. I got the radios from someone off the street at a great price, and I have nothing to prove that I bought them."

A search of Scapoli's father's garage December 1, 1971 yielded 447 cartons of Panasonic radios model RC–7021, 22 cartons of model RF–951, along with several loose sets in models which corresponded with those that were the subject of the theft from the terminal at Hoboken.

The appellants join to challenge the convictions on two common claims of error. First, they contend that the evidence is insufficient to establish that the radios recovered from them were stolen. Secondly, it is urged that that evidence is insufficient to prove that either defendant knew the radios were stolen.

■ Conviction for possession of goods stolen from interstate shipment requires evidence of dominion and control of the property that was the subject of the theft. United States v. Kearse, 444 F.2d 62, 63 (2d Cir. 1971); United States v. Casalinuovo, 350 F.2d 207, 209 (2d Cir. 1965). The evidence is clear and undisputed that both defendants were in actual possession of various cartons of Panasonic radios that were of the same models as those contained in the shipment stolen from the freight terminal at Hoboken. Both defendants manually transported the property in the shipping cartons. The goods were seized at the Royal Rhythm, a store jointly owned and operated by the defendant Scapoli. Other cartons were recovered in the van registered to Jaymie Records, a business enterprise of the defendant Baum's association. The record presents substantially more than the mere presence as bystanders, at or near the contraband. The defendants were observed as active participants in the transportation and disposition of the property. See, United States v. Romano, 382 U.S. 136, 141, 86 S.Ct. 279, 15 L. Ed.2d 210 (1965).

Neither appellant questions the fact that a ship's containers loaded with 906 cartons of Panasonic radios, imported from Japan, of the type and model seized from their possession were stolen on November 12, 1971. However, they maintain the prosecution failed to prove that the radios taken from their possession were stolen property within 18 U. S.C. § 659.[1]

---

1. During a pretrial conference, called by the court, counsel for the defendants

Fields and Scapoli stipulated that the radios recovered from these defendants

The Government was not required to present direct evidence that the radios found in the defendants' possession were stolen. United States v. DeKunchak, 467 F.2d 432, 436 (2d Cir. 1972); United States v. Marcus, 429 F.2d 654, 656 (3d Cir. 1970). There was substantial convincing evidence from which the jury could infer the cartons which the Government recovered from them were indeed the same property that was the subject of the theft from the terminal at Hoboken.

The radios were unloaded at the Royal Rhythm store the day the shipment was stolen from the freight terminal. The Royal Rhythm store sold only two or three Panasonic radios in a week. No preparation had been made to receive the shipment. The cartons were soon transported to distant storage locations.

"Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be of controlling weight, unless explained by the circumstances or accounted for in some way consistent with innocence." Wilson v. United States, 162 U.S. 613, 619, 16 S.Ct. 895, 898, 40 L.Ed. 1090 (1896). Rugendorf v. United States, 376 U.S. 528, 536, 84 S.Ct. 825, 11 L.Ed.2d 887 (1963).

The defendant Baum offered no accounting for his possession of the stolen property. The explanation given by Scapoli that he got the radios off the street at a great price is not consistent with innocence. There is ample evidence to sustain the jury's finding that the defendant Scapoli knew the radios were stolen from interstate shipment. Surely with the testimony of the witness Greenhalgh, which is later considered, there is evidence to sustain such a finding as to the defendant Baum. See United States v. DeKunchak, supra, 467 F.2d at 436;

United States v. Casalinuovo, supra, 350 F.2d at 209 (2d Cir. 1965); United States v. Crisafi, 304 F.2d 803, 804 (2d Cir. 1962).

In referring to the cartons found in the possession of the defendant Baum, Agent Smith testified that authorization had been obtained "to arrest anyone in custody of the cartons which had been identified as stolen." The defendants' objection was sustained and the court ordered the answer to be stricken. The appellant's argument that the failure of the trial judge to further admonish the jury, particularly in the absence of a request, is without substance.

The remaining question concerns evidence of a prior offense which involved the defendant Baum and the Government's witness Lawrence Greenhalgh. Both appellants claim prejudice by the evidence given by this witness.

Before trial, counsel for the defendant Baum requested the names, addresses and telephone numbers of all Government witnesses which the prosecution intended to call, together with any record of prior felony convictions. At the hearing in the discovery motion, defense counsel stated that the United States Attorney had informed Baum that various persons in custody would testify against him concerning his character and past criminal activity. It was urged upon the court that the defendant had no knowledge of these matters and since the prospective witnesses were in custody, disclosure could have no detrimental effect on their safety or well-being. The motion was denied.

Greenhalgh was offered as the Government's final witness to prove Baum's knowledge that the radios were stolen. The defendants Fields and Scapoli moved for severance on the ground that the proposed evidence, although offered against Baum alone, would prejudice

were stolen from an interstate shipment in Hoboken, New Jersey. Counsel for Baum asked for an opportunity to discuss with co-counsel whether he should similar-

ly stipulate as to his client. The result of the consultation is not shown in the record.

them as well. Over the objection of all defendants, the witness testified that he met Baum shortly before the Easter holidays in 1970 and sold him a trailer load of 42,000 records for $52,000. He related that the records were sold to Baum in several deliveries at his store on Flatbush Avenue in Brooklyn. Baum was known to the witness as "Dick from Jaymie Records." According to Greenhalgh, the first payment of $12,000 was in cash.

At the completion of direct examination the defendant Baum asked for a continuance until the next day in order to prepare for cross-examination.[2] The court inquired if counsel had the witness' criminal record. When the question was answered in the affirmative, the court indicated that was enough and ordered the trial to proceed.

On cross examination the witness testified that he asked the government for a reduction of his sentence as consideration for testifying concerning his conviction for possession of a trailer load of stolen goods. He also gave evidence that he had been involved in some sixty-two hijackings.

The witness testified that he was brought to Baum's store by Joseph Diaz. Greenhalgh insisted that no check was given to him nor to Diaz by Baum, and that payment for the records was in cash. Counsel renewed the request for a continuance to produce the checks which were given by Baum to Diaz. The request for a continuance was denied when the government unilaterally stipulated that if the defendant's bookkeeper were called, he would testify that a check for

$4,697 was paid by Baum to Diaz on June 17, 1970.

■ The question of the reception of evidence of the knowing possession of stolen goods, other than the crime charged in the indictment, is unsettled by conflicting precedents. See, 2 J. Wigmore § 326 (3d Ed.). In this circuit it is clear that such evidence may be received, discriminately. There is no hard and fast rule to control in all cases. Admissibility is governed by considerations explained by Judge Learned Hand writing in United States v. Brand, 79 F.2d 605, 606 (2d Cir. 1935):

> The argument [for exclusion] is based on the doctrine of Regina v. Oddy, 2 Denison, C.C. 272, Copperman v. People, 56 N.Y. 591, and Edwards v. U. S., 18 F.2d 402 (C.C.A. 8), that evidence of the receipt of other stolen goods is not admissible unless the prosecution proves that the accused knew them to have been stolen. At least in this circuit there is no such doctrine . . . for the competence of such evidence does not depend upon conformity with any fixed conditions, such as upon direct proof of scienter, or the identity of the thief in the earlier instance, or of the victim, or the number of instances in which the accused received stolen goods, or the similarity of the goods stolen. These are all relevant circumstances but not necessary constituents. Nor can we see any basis for distinguishing between knowledge and intent in such cases. The judge must decide each time whether the other instance or instances form a basis for sound infer-

2. After Greenhalgh's direct examination Baum's counsel requested:

Mr. Todel: As a result of having this witness called, the Government calling this witness, I would want a continuance because to check out certain information which I am in the process of doing now, and I would like to have this witness called back tomorrow so that I can be in a position to—

The Court: Oh, no. Your client is there. He knows whether this happened or whether it didn't.

Mr. Todel: It is not with reference to what did or didn't happen, your Honor, but it is a question of my preparing a cross-examination of this particular witness.

The Court: Do you have his criminal record?

Mr. Todel: Yes, I do.

The Court: That is enough.

ence as to the guilty knowledge of the accused in the transaction under inquiry; that is all that can be said about the matter.

■ It is clear that Judge MacMahon's admission of Greenhalgh's testimony cannot be disturbed on the question of relevancy. The court's ruling was well within the boundaries of a long line of decisions that extend from Sapir v. United States, 174 F. 219 (2d Cir. 1909) to United States v. Birrell, 447 F. 2d 1168, 1173 (2d Cir. 1971). See also Proposed Federal Rules of Evidence 404(b).

Yet the question presented in this appeal cannot be answered in terms of relevance and probative value alone. The appellant Baum contends the prejudicial impact of Greenhalgh's testimony, coupled with the denial of prior witness identification by the government deprived the accused of a fair trial.

Given the undoubtable relevancy, the question is not that the evidence is without probative value, but that it probes too deeply into the past life and character of the accused concerning conduct which the indictment does not call upon him to answer. Wigmore has marshalled the varied reasons for exclusion of prior criminal conduct and reduced them to three: "(1) The overstrong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts; (2) the tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offenses;—(3) the injustice of attacking one necessarily unprepared to demonstrate the attacking evidence is fabricated. . . ." J. Wigmore, Evidence § 194, pp. 646, 648 (3d Ed.). Each and all of these factors are present in Baum's case.

■ The question of the admissibility of the 1970 offense requires the trial judge to balance all the relevant considerations that might bear on the compet-

ing factors of probative value against undue prejudice. United States v. Bradwell, 388 F.2d 619, 620–622 (2d Cir. 1968); United States v. Deaton, 381 F. 2d 114, 117 (2d Cir. 1967). The balance was found in favor of the needs of the government to prove guilty knowledge at the risk of prejudice to the accused.

While this ruling was a proper exercise of the district court's discretion, *cf.* United States v. Bradwell, supra, 388 F. 2d at 622, the effect of the evidence was such as to require that the defense be given fair opportunity to meet it. The government offer, as far as the defense was concerned, was made in the dark. The identity of the witness and the substance of his testimony was apparently unknown to the trial judge—and it was withheld from the defense until Greenhalgh was called as the prosecution's final witness of the trial.

Confronted for the first time with the accusation of prior criminal conduct and the identity of the accuser, the defendant had little or no opportunity to meet the impact of this attack in the midst of the trial. This precarious predicament was precipitated by the prosecutor.

■ Ordinarily it is disclosure, rather than suppression, that promotes the proper administration of criminal justice. See Dennis v. United States, 384 U.S. 855, 870, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); United States v. Youngblood, 379 F.2d 365 (2d Cir. 1967).

■ There were no valid considerations to justify the concealment of Greenhalgh's identity as a prospective witness, as in United States v. Persico, 425 F.2d 1375 (2d Cir. 1970). Greenhalgh was in federal custody. Advance disclosure presented no possible source of present danger to the witness or others. There was no thought that this witness would be reluctant to testify upon disclosure since he was a volunteer who solicited the government to call upon him in the hope of early release from confinement.[3]

---

3. Absent these factors or other valid considerations, prevailing concepts of crim-

inal justice oblige the prosecuting attorney to disclose to the defense the

 It is the duty of the government to present its case against the defendant fairly. Little can be added to Justice Traynor's statement—"A defendant has hardly had a fair trial if he has been denied the opportunity to discover evidence or information crucial to his defense."[4]

The failure to reveal Greenhalgh's identity until he was presented as a witness, confronted the trial judge with the hard choice of interruption of the trial or denial to the defense of a reasonable opportunity of meeting the severe impact of this aspect of the prosecutor's evidence. Such tactics were condemned, and called for the reversal in United States v. Kelly, 420 F.2d 26, 29 (2d Cir. 1969). In the language of Judge Smith "The course of the government smacks too much of a trial by ambush, in violation of the spirit of the rules." To be sure, Baum's attorney did not make a very forceful showing in the district court of what cross-examination or rebuttal material he could secure. But in a case so close as this, we would rather give the defendant the benefit of the doubt than let the Government reap even a slight possibility of benefit from what we regard as a lack of candor unworthy of a prosecutor.

 Here, no reason for nondisclosure was advanced by the government. Greenhalgh's testimony was crucial to the prosecution; it was equally crucial to the defense. Cf. Rovario v. United States, 353 U.S. 53, 60, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); United States ex rel Wilkins, 326 F.2d 135, 140 (2d Cir.

1964). We hold a new trial is required to afford the defendant Baum a fair opportunity to meet the critical and damaging proof of an offense not presented against him in the indictment.

 Scapoli's appeal has a different bearing. When Greenhalgh's testimony was given concerning his dealing with Baum, and at the request of counsel for his co-defendants, Judge MacMahon specifically cautioned the jury—"Yes, none of it is binding on the defendants Scapoli and Fields. This testimony is being taken solely on the question of whether the defendant Baum committed a prior similar act if you believe this witness, whether he knew that the goods in question were stolen."

Later, in submitting the case, the court referred to Greenhalgh's testimony and specifically instructed the jury on this point.—"You may not and you must not consider that testimony against any defendant other than Baum. In short, you cannot consider him in any way in determining the guilt or innocence of the defendants Fields or Scapoli."

The fact that Fields was acquitted is a convincing indication that the jury heeded the court's cautionary instructions.[5] Absent anything to the contrary, we take it that they did. We find no error in the court's failure to grant the defendant Scapoli's motion for severance.

The judgment of conviction of the defendant Scapoli is affirmed. The judgment is reversed as to the defendant Baum and the case remanded.

names and addresses of witnesses he intends to call at the trial. American Bar Association Standards Relating to Discovery and Procedure Before Trial § 2.1 (iv) (Approved Draft 1970); Proposed Rules of Federal Criminal Procedure § 16(a)(1)(VI), 48 F.R.D. 553 (1970); 3 C. Wright, Federal Practice and Procedure (Criminal) § 254, p. 514.

4. Traynor, Ground Lost and Found in Criminal Discovery, 39 N.Y.U.L.Rev. 228, 242 (1964).

5. Unlike Scapoli, however, there was no evidence that Fields knew the property was "bought on the street at a great price" without any evidence of title.