UNITED STATES of America

v.

George STOFSKY and Charles Hoff
et al., Defendants.

UNITED STATES of America

v.

George STOFSKY and Al Gold et
al., Defendants.

Nos. 73 Cr. 614, 73 Cr. 615.

United States District Court,
S. D. New York.

Dec. 21, 1973.

610

Weiss, Rosenthal, Heller & Schwartzman, New York City, by Elkan Abramowitz, Paul K. Rooney, New York City, for union defendants.

Paul J. Curran, U. S. Atty., New York City, by Maurice M. McDermott, Asst. U. S. Atty., for United States.

PIERCE, District Judge.

## MEMORANDUM AND ORDER

Seven officials and employees of the Furriers Joint Council, a union representing workers in New York's fur garment manufacturing industry, have been·variously charged in two separate indictments with, among other things, violations of the provisions of the Organized Crime Control Act of 1970, directed at racketeer influenced and corrupt organizations, 18 U.S.C. § 1961 et seq.

Defendants have joined[1] in an omnibus pre-trial motion seeking dismissal of

---

1. All seven of the union officials and employees charged in one or the other or both of the indictments are represented jointly by the same two attorneys. Mindful of the potential conflict of the Second Circuit's concern with respect to this issue, see, e. g., *Morgan v. United States,* 396 F.2d 110 (2d Cir. 1968), this Court held a special conference with the defendants and their attorneys on May 9, 1973. There, the attorneys were examined on the record with respect to their estimate of their abilities to give each defendant an untrammeled defense. Each defendant was examined individually as to his understanding of his right to undivided assistance of counsel of his choice and warned that counsels' joint representation could conceivably impair their effectiveness on behalf of each individual defendant. Each was informed that if he could not afford to hire an individual attorney, the Court would appoint one. All stated that they understood these rights, that their attorneys had explained these rights to them and that they believed a unified defense was in their best interests. With counsels' assurance to the Court that any future conflict will be brought to the Court's attention immediately, and given the nature of the charges which seem to justify a unified defense, joint representation was permitted.

various counts of each indictment, and for particulars and discovery, and for a government investigation with respect to possible wire-tapping and government-sponsored burglary. This memorandum and order will deal with most of defendants' motions.

The structure of each indictment is essentially the same, although a somewhat different set of defendants is named in each.[2] The foundation for each indictment is the section of the Organized Crime Control Act which provides that:

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

"Racketeering activity" is defined in 18 U.S.C. § 1961(1)(A)–(D) as:

"(A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year;

(B) any act which is indictable under any of the following provisions of title 18, United States Code . . . section 1951 (relating to interference with commerce, robbery, or extortion) . . . . .

(C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions of payments and loans to labor organizations) or . . .

(D) . . .'"

"Pattern of racketeering activity" is defined in 18 U.S.C. § 1961(5). It requires

"at least two acts of racketeering activity, one of which occurred after the effective date of this chapter (October 15, 1970) and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity; . . .'"

Each indictment, in a series of substantive counts, charges independent federal crimes. These substantive crimes, which are also "racketeering activities" as defined in § 1961(1)(B) or (C), are then incorporated as predicate offenses in yet another substantive count in each indictment charging that certain of the defendants named therein conducted or participated in the affairs of the union through a pattern of racketeering activity, as proscribed in § 1962(c) (hereinafter "the racketeering offense").

Indictment 73 Cr. 614 names defendants Stofsky, Hoff, Gold and Lageoles and is premised, in the main, upon alleged substantive violations of the Taft-Hartley Law, 29 U.S.C. § 186(b), which prohibits acceptance of certain payments by union officers and agents from employers. In 21 counts (2–22) it charges that on 21 different occasions between January 1967 and September 1971, certain of those defendants unlawfully accepted payments from certain union-shop manufacturers in return for permitting these manufacturers to sub-contract fur manufacturing work out to non-union shops in contravention of the collective bargaining agreement between the union-shops and the union. Count 23 of the indictment incorporates as predicate

---

**2.** This criminal prosecution was commenced with a single forty-eight count indictment filed March 3, 1973. It named not only the seven union officials and employees but also four officials from union-shop manufacturers. After the original pre-trial motions were filed with respect to the single indictment, the government superseded with three indictments filed on June 21, 1973. In effect, the union-shop manufacturers were severed and charged in Indictment 73 Cr. 616, and the charges against the union officials and employees were divided up more or less by the type of acts charged, in Indictments 73 Cr. 614 and 73 Cr. 615, the indictments at issue herein. Some of the union defendants are not named in the first who are named in the second, and vice versa.

offenses 15 of the alleged independent violations of the Taft-Hartley Act and charges a racketeering, offenses in violation of 18 U.S.C. § 1962(c) against defendants Stofsky and Gold. Count 1 charges all four of the defendants with conspiracy to violate both the Taft-Hartley Law and the racketeering statute. In addition, the indictment includes, in Count 24, a charge of obstruction of justice, 18 U.S.C. § 1503, against defendants Stofsky and Gold. And finally, the indictment includes six counts of income tax evasion, 26 U.S.C. § 7201, two against defendant Stofsky, two against defendant Hoff and two against defendant Gold.

Indictment 73 Cr. 615 names defendants Stofsky, Gold, Apostolides, Lageoles, Logios and Ziebal and is based, in the main, upon alleged violations of the Hobbs Act, 18 U.S.C. § 1951, which prohibits extortion in interference with interstate commerce. In 12 counts (3–15) it charges that on 12 different occasions in January of 1972, certain of the defendants threatened certain non-union shop fur manufacturers with injury to persons and property if these manufacturers did not cease soliciting sub-contracts from the union-shop manufacturers. Count 2 of the indictment incorporates as predicates the 12 independent acts alleged in Counts 3–15, and charges a racketeering offense against each of the defendants named in the indictment. Count 1 charges all six defendants with a conspiracy to violate both the Hobbs Act and the racketeering statute.

## A. MOTIONS TO DISMISS

Pursuant to Fed.R.Crim.P. 12, defendants have moved to dismiss various counts of each indictment on a variety of grounds.

1. *Constitutionality of 18 U.S.C. § 1962(c).*

Defendants assert that while the definitional section of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961, adequately defines "person," "enterprise," "racketeering activity," and "pattern of racketeering activity," it never defines the phrase, "conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ." as used in § 1962(c). It is contended that § 1962(c) thus fails to set forth the degree and intensity of the relationship required between the racketeering activity and the usual operation of the enterprise, and that without such definition the prospective defendant cannot predict with any certainty the conduct sought to be made unlawful. The constitutional requirement of definiteness in criminal statutes, they urge, would require the statute to state whether or not the alleged racketeering activity "must be in furtherance of the enterprise; or if it need be merely not harmful to the enterprise, or even contrary to the goals of the enterprise" . . . or whether it "must be a vital and constant part of the operation of the enterprise or if it need be only random and barely related to the usual operation of the enterprise."

■ In this Court's view, the statute is clear enough. The elements of the predicate offenses are well-defined and established. It would be futile for a person to argue that he had no warning or knowledge that his commission of such acts would violate the law. Thus, the only serious question is whether § 1962(c) gives him adequate warning that the commission of more than one such criminal act under certain circumstances constitutes an additional, separate crime for which there is a separate penalty. With respect to this aspect, the statutory scheme of § 1962(c) is not unlike that of 21 U.S.C. § 848 which proscribes "a continuing criminal enterprise" in drug trafficking. That statute also creates a separate offense based on the commission of predicate crimes under certain defined circumstances. Neither statute contains a requirement of scienter independent or in addition to that necessary to prove the predicate crimes. It was characterized as a business regulatory statute and upheld against a vagueness attack in *United States v. Manfredi,* 488 F.2d 588, 2d Cir.

1973, with the Court of Appeals relying in part on *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110, 115 (1972), where the Court said, "[I]n the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed." If this language is applicable to 21 U.S.C. § 848, where the purpose of Congress is to eradicate totally illicit enterprises, it would seem all the more applicable to 18 U.S.C. § 1962 where the congressional purpose is to eradicate criminal means of acquiring, maintaining and conducting any enterprise affecting commerce.

Given the leeway of a regulatory statute (and even without such leeway), § 1962(c) sufficiently places men of reasonable intelligence on notice that persons employed by the type of enterprise therein defined cannot resort to a pattern of specified criminal acts in the conduct of the affairs of that enterprise. Set forth, then, on the face of the statute is a necessary connection between the person who would commit the enumerated predicate acts and the enterprise, and between the acts and that person's participation in the operations of the enterprise.

It is true that the statute does not define this connection by distinguishing between predicate acts which play a major or a minor role, or any role at all, in what might be seen as the usual operations of the enterprise; nor does it require that such acts be in furtherance of the enterprise, as defendants suggest it must.

In this Court's view, the statute fails to state these requirements because Congress did not intend to require them in these terms. The perversion of legitimate business may take many forms. The goals of the enterprise may themselves be perverted. Or the legitimate goals may be continued as a front for unrelated criminal activity. Or the criminal activity may be pursued by some persons in direct conflict with the legitimate goals, pursued by others. Or the

criminal activity may, indeed, be utilized to further otherwise legitimate goals. No good reason suggests itself as to why Congress should want to cover some, but not all of these forms; nor is there any good reason why this Court should construe the statute to do so. It plainly says that it places criminal responsibility on both those who conduct and those who participate, directly or indirectly, in the conduct of the affairs of the enterprise, without regard to what the enterprise was or was not about at the time in question. This may be broad, but it is not vague.

The government has suggested that the relationships set forth in the statute are best characterized as requiring:

  a.  that the defendant committed two or more of the underlying criminal offenses;

  b.  that those offenses were committed in the course of his employment by the enterprise in question;

  c.  that those offenses were connected with each other by some common scheme, plan or motive so as to constitute a pattern and not simply a series of disconnected acts.

To the extent that the government's emphasis is on objective factors of employment status and commission of the predicate acts, this Court accepts the first two suggested elements as accurately stating the relationships set forth on the face of the statute. The third suggested element is to be found no where in the statute itself, either in § 1961(5) where "pattern . . ." is cast in quantitative terms only, or in § 1962 where it is used as an element of the crime charged.

■ The Court, however, agrees with the proposition, implicit in the government's suggestion, that the word "pattern" should be construed as requiring more than accidental or unrelated instances of proscribed behavior. This word, although it is relatively new to the legislative criminal lexicon, has received such interpretation under the civil rights acts. See, e. g., *United States v. Gilman,*

341 F.Supp. 891, 906 (S.D.N.Y.1972). Further support for this interpretation is found in a simultaneously enacted section of the Organized Crime Control Act of 1970, 18 U.S.C. § 3575 where a "pattern of criminal conduct" is a predicate for special offender status for the purposes of sentencing. This term is defined in § 3575(e) as follows:

". . . criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."

Statutes enacted together within the Organized Crime Control Act of 1970 have been construed *in pari materia.* See *United States v. Becker,* 461 F.2d 230 (2d Cir. 1972). While § 3575 concerns a pattern discerned for post-conviction purposes and thus involving considerations somewhat different from those involved in § 1961 et seq., the policies which have led Congress to create a separate crime for a pattern of criminal activity are not very different from those which have led it to create increased penalties for a pattern of conduct which is criminal. Without opining whether § 3575(e) is sufficient for its purposes, it would seem that it may be used to cast light on the word "pattern" as used in § 1961. Also, it should be noted that in spite of the quantitative nature of the § 1961 definition of "pattern", the major concern of Congress, when it enacted § 1961 et seq. was the special danger to legitimate business of a continuity of racketeering activity. See S.Rep. No. 91–617, 91st Cong., 1st Sess. 78 (1969).

The Court's final consideration in this matter is the fact that under § 1961 et seq., it is possible for an employee of an enterprise to be put in jeopardy of a twenty year prison term, a $25,000 fine and substantial forfeitures for the commission of two misdemeanors within a period of ten years. Of course it is not necessary or even desirable to consider the extreme hypothetical case in making the determinations here, but the possibility stated above is not far from the reality of Indictment 73 Cr. 614 presently before the Court. The racketeering count in this indictment is premised on a series of misdemeanors, violations of the Taft-Hartley Law, 29 U.S.C. § 186(d). The time span between acts could be about a year and a half. Without a limiting construction, conviction on any two of the misdemeanors, plus proof of employment and that the acts were committed in the course of employment could lead to conviction on the racketeering offense. Yet, the entire statutory scheme indicates that if these acts were isolated and unrelated they do not add up to the kind of activity Congress meant to describe when it used the word "pattern." This Court therefore construes the word "pattern" as including a requirement that the racketeering acts must have been connected with each other by some common scheme, plan or motive so as to constitute a pattern and not simply a series of disconnected acts.

With these interpretations, coupled with this Court's concurrence with *United States v. Parness* (S.D.N.Y.1973), 73 Cr. 157, May 17, 1973, which held that § 1962 requires proof beyond a reasonable doubt for each element of each predicate offense, this Court holds that the statute provides "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States v. Petrillo,* 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877, 1883 (1947).

Therefore, defendants' motions to dismiss Count 2 and portions of Count 1 of Indictment 73 Cr. 615, and Count 23 and portions of Count 1 of Indictment 73 Cr. 614 for vagueness are hereby denied.

2. *The sufficiency of Indictment 73 Cr. 615.*

Defendants have attacked Indictment 73 Cr. 615 in its entirety. Their main argument is that any portion of it based upon the Hobbs Act, 18 U.S.C. § 1951, does not state an offense under *United States v. Enmons,* 410 U.S. 396, 93 S.Ct.

1007, 35 L.Ed.2d 379 (1973) where the Court held that this federal extortion statute does not reach the threat or use of violence to achieve legitimate labor union objectives.

The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear . . . ." 18 U.S.C. § 1951(b)(2) (emphasis added). In *Enmons*, the Court affirmed a district court dismissal of an indictment which charged labor union officials and members with wrongful use of actual force to obtain property from a struck employer, in the form of higher wages and other employment benefits. The district court had held that the indictment failed to state an offense because "the union had a right to disrupt the business of the employer by lawfully striking for higher wages . . . ." *United States v. Enmons*, 335 F.Supp. 641, 646 (E.D.La.1971). The Supreme Court repeated those words and reasoned that there had been no *wrongful* use of force. "Wrongful," the Court said, "has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." 410 U.S. at 400, 93 S.Ct. at 1009, 35 L.Ed.2d at 383. As examples of the types of alleged objectives which would not be legitimate, the Court cited violence by union officials against an employer in order to obtain personal payoffs and union violence to exact "wage" payments from employers in return for "imposed, unwanted, superfluous and fictitious services". Id. The key, the Court seems to indicate, is whether the property has been misappropriated. Id.

Here, the allegations as to the objectives of the defendants' alleged threats are scattered throughout Indictment 73 Crim. 615, but in sum, the government contends that the defendants, officers or employees of the Furriers Joint Council, used wrongful force to temporarily force the closing down of non-union fur shops to whom union shop manufacturers were sub-contracting out fur manufacturing work. The property obtained, the indictment alleges, was in the form of the non-union shop's right to solicit business for and to operate their shops.

The defendants assert that given these allegations, the indictment alleges no wrongful threats within the meaning of the Hobbs Act as interpreted in *Enmons*. They say that such threats, if they occurred at all, were directed at closing down the non-union shops because they were accepting sub-contract work from union-shops in violation of the terms of the collective bargaining agreements between the union and the union-shops.[3] This they claim is a legitimate union objective.

The government counters with the assertion that *Enmons* does not extend to acts or threats against companies or manufacturers who are not parties to the collective bargaining agreement in question. In fact, the government asserts, such pressure against presumably neutral third parties in a labor dispute is an unfair labor practice prohibited by the provisions of 29 U.S.C. § 158, and as such cannot be said to be in pursuit of a legitimate labor goal.

As valid as this point might be with respect to any other industry, it is difficult to fathom why the government has asserted it here without further explanation, inasmuch as the garment industry is specifically exempted from the secondary boycott provisions of the Landrum-Griffith Act, 29 U.S.C. § 158(e). See *National Woodwork Manufacturers v. NRLB*, 386 U.S. 612, 637–38, 87 S.Ct.

---

**3.** The indictment itself makes no mention of the involvement of a collective bargaining agreement, although it is only fair to notice that in Indictment 73 Cr. 614 there is an allegation of the existence of such a collective bargaining agreement during 1967 through September 1971 (the dates covered by the acts charged in the indictment) between the union shops and the union, and that sub-contracting out of fur manufacturing work to non-union shops was in violation of it. This Court has no reason to believe that it was not still in force during 1972, when the alleged threats occurred.

1250, 1264–65, 18 L.Ed.2d 357, 374 (1967). Further, the language in *National Woodwork* would seem to support the affirmative proposition that the garment industry proviso "was designed to *allow,* secondary pressures to counteract the effects of sweatshop conditions in an industry with a highly integrated process of production . . ." Id. at 638, 87 S.Ct. at 1265, 18 L.Ed.2d at 374 (emphasis added). See also, *Greenstein v. National Skirt & Sportswear Ass'n, Inc.,* 178 F.Supp. 681, 688 (S.D.N.Y.1959).

Given the Congressional imprimatuer on the use of secondary boycott pressures in the garment industry, it may very well be that an allegation of union activity with the purpose of closing down non-union shops, without more, will not support the indictment in this case. On the other hand, it must be recognized that *Enmons* deals specifically with employer-employee disputes and clearly distinguishes those cases where the dispute is between a union and a third-party where the object of the union's violence is to obtain protection money or to force the non-union manufacturer to hire unwanted, superfluous workers; or where the object of the extortion is personal gain on the part of the union official or employee. Doubtless, *Enmons* would not protect the defendants here if these were the underlying goals of the threats. But, the government has not alleged any of these illegitimate goals in the indictment.

Of course, it is possible that the government's proof at trial would demonstrate that the defendants were in no sense pursuing legitimate union objectives, or were pursuing legitimate goals which *Enmons* would not protect. But, given the present language of the indictment, which like the indictment in *Enmons* does not suggest that the objective alleged is illegal, and it appearing that

there is a possibility that the union had a lawful claim to the "property" it is said to have obtained, this Court is more than hesitant to invest the estimated five weeks trial time only to find at the close of all the evidence that the acts charged do not constitute federal crimes as a matter of law.[4]

■ Under the circumstances, this Court intends to take the unusual step of going beyond the face of the indictment at this pre-trial stage and requiring the government to file an additional submission on critical factual issues as well as legal issues.

In this Court's view, the focus of the inquiry with respect to the issues presented, is not whether the non-union shops had a general right under the Fifth Amendment to stay in business, but whether the union had a "right to disrupt their businesses." If the government contends that by no legitimate means could the union assert a lawful claim to the "property" which the defendants are charged with obtaining from the non-union manufacturers, then it is to be assumed that its position is that the indictment is sufficient as it is. However, if the government allows that the union could by some means, have asserted a right to this "property" then it may be required to make a showing as to the nature of the circumstances which renders illegitimate the particular effort charged in this indictment. Therefore, the government is requested to address itself to the following:

1. Does the government contend that there was not a valid collective bargaining agreement between the union-shops and the union during all relevant times charged in this indictment, which contained a clause prohibiting sub-contracting to non-union shops as set forth on page 9 of defendants' memorandum of law?

---

4. In addition to the Hobbs Act allegations, the government premises that racketeering count and a portion of the conspiracy count on the New York State law of extortion and coercion pursuant to the definition of "racketeering activity" contained in 18 U.S.C. § 1961(1)(A).

The defendants raise issues with respect to the sufficiency of both of these alleged predicate offenses. This Court will deal with these issues when this motion attacking the entire indictment is finally resolved.

2. Does the government contend that the non-union shops were not soliciting and/or accepting sub-contracts in spite of the terms of this contract?

3. Assuming that the government agrees that there was a contract as set forth and that the non-union shops were soliciting or accepting sub-contracts in spite of it, on what legal basis does the government assert that the defendants, as representatives of the union, had no right to pressure the non-union shops to cease soliciting or accepting sub-contracts.

4. Or on what other factual basis does the government assert that the objectives of the defendants were not legitimate labor goals? For instance, does the government contend that the objective of the defendants was personal benefit as opposed to benefit for the union? Or, for instance, does the government contend that the pressure was to force the non-union manufacturers to take on unwanted, superfluous workers, or to pay protection?

After the government addresses itself to these issues, in any manner which. it deems appropriate, the Court, in an effort to resolve this legal issue prior to trial, may order a hearing and argument, if necessary. Decision on this portion of defendants' motions is, meanwhile, reserved.

3. *Multiplicitousness as between the substantive racketeering count and the independently charged Taft-Hartley counts in Indictment 73 Cr. 614.*

■ Defendants assert that the elements of Count 23 of Indictment 73 Cr. 614 which charges the racketeering offense predicated upon violations of the Taft-Hartley Law, are the same so the elements of the individual violations of the Taft-Hartley Law set forth in Counts 2–17 of the same indictment, and that therefore Count 23 should be dismissed as multiplicitous. The assertion is premised on the fact that in both instances the essential elements include proof of employment status with the union and that the violations were committed in the course of that employment.

The government responds that "[offenses] are the 'same' only when 'the evidence required to support a conviction upon one of them would have been sufficient to warrant a conviction upon the other.'" *United States v. Kramer,* 289 F.2d 909, 913 (2d Cir. 1961). Applying this test, the government contends that the racketeering offense requires as an additional and distinct element of proof that the predicate acts have "a factual nexus so as to constitute a pattern of racketeering activity *which was instrumental in the conduct of union affairs.*" (emphasis added).

This Court accepts the first portion of the government's assertion as stating the distinguishing element between the individually charged violations and the racketeering offense incorporating them, and for this reason holds that the indictment is not multiplicitous on its face. However, it must be noted that although the government may very well be prepared to prove the nexus as set forth in the emphasized portion, it does not state an essential element of the racketeering offense as decided in § A, 1, *supra* of this memorandum. In the government's own words as set forth therein, the additional element in the racketeering count is that the predicate offenses must be "connected with each other by some common scheme, plan or motive so as to constitute a pattern and not simply a series of disconnected acts." This could well include, but need not necessarily include, proof that the pattern was instrumental in union affairs.

Most of the other issues raised here are not ripe. To the extent that the question of double jeopardy is concerned with successive prosecutions for the same offense, it may never ripen.

Further, the issue of multiple punishment for the same criminal acts will not ripen unless and until guilty verdicts are returned on the alleged overlapping counts, or unless and until it becomes obvious at trial that the evidence with

respect to the contested counts is, in fact, the same. In that event, this Court will be required to examine more intensely the congressional intent underlying § 1962(c), and strike certain counts, or require the government to elect, or use other remedies available. See *United States v. Ploof*, 464 F.2d 116, 120–21 (2d Cir. 1972). Clearly the allegation does not call for a dismissal in any event. *United States v. DeStafano*, 429 F.2d 344 (2d Cir. 1970).

Thus, the only ripe issue raised by these portions of defendants' motions at this pre-trial stage is the alleged multiplicitousness of this indictment as it may affect the fairness of the trial.

The policies underlying this consideration are concerned with whether multiplicitousness will confuse and lengthen the trial, or prejudicially suggest to the jury that the defendants have committed a larger number of crimes. *United States v. Ketchum*, 320 F.2d 3 (2d Cir.) *cert. denied*, 375 U.S. 905, 84 S.Ct. 194, 11 L.Ed.2d 145 (1963).

Even if it appeared that the counts here were multiplicitous, the policies would not have much impact with respect to this particular indictment. It would serve little purpose if the government, required to elect, chose to drop Counts 2–17. It would still have to prove at least two of those offenses against each defendant named in the surviving racketeering count, and nothing would prevent it from attempting to prove all 15. Since full proof is required for each of the predicate offenses under the racketeering statute (see *United States v. Parness, supra*) no trial time would be saved and the jury would be exposed to no less evidence of criminality. Indeed, it could further confuse the jury already faced with a complex indictment.

On the other hand, assuming the government elected to drop Count 23 and to proceed on the 15 substantive Taft-Hartley counts this[4] Court fails to see how much trial time would be saved. Also, the jury would be faced with only one less count, which does not represent a substantial lessening of any prejudice which might be inherent in a 30-count indictment.

The defendants' motions with respect to multiplicity and the potential for multiple punishment are therefore denied at this time.

4. *Multiplicitousness as between the racketeering count of Indictment 73 Cr. 614 and the racketeering count of Indictment 73 Cr. 615.*

Defendants contend that the racketeering counts which are contained in each indictment are incapable of proof as separate crimes, in spite of the fact that the Hobbs Act serves as the underlying predicate for 73 Cr. 615, and the Taft-Hartley Law serves as the underlying predicate for 73 Cr. 614, and different periods of time are charged for the two different counts. They assert that the essential gravamen of the racketeering offense is "conducting the affairs of the enterprise," not the different acts constituting the pattern of racketeering activity. Thus, it is urged, it is impossible as a matter of law for a person to be charged with more than one § 1962(c) crime while conducting or participating in the conduct of the affairs of any one enterprise.

They properly recognize that the issue raised is the equivalent of an unmatured double jeopardy problem since these indictments—if they both stand—will be tried one after another. They also recognize that the issue will turn, first, on an interpretation of congressional intent with respect to § 1962(c). This Court may never need to reach these complex questions should its reservations with respect to 73 Cr. 615, § A, 2 *supra,* result in dismissal of that indictment in part or in total. Decision is therefore reserved on this motion.

5. *Obstruction of Justice, 73 Cr. 614*

■ Defendants Stofsky and Gold are charged in Count 24 of Indictment 73 Cr. 614 with endeavoring to influence a grand jury witness not to testify. They assert that the count fails to charge an

offense in that it does not state affirmatively that the witness had no right to refuse to testify, the implication being that if a witness could validly take the Fifth Amendment there could be no offense. Defendants further assert that the things allegedly promised to the prospective witness were items to which he had a legal right and which they had a legal right to offer to him, and that therefore no crime is alleged.

These arguments overlook the fundamental element charged, to wit, that the defendants corruptly endeavored to influence the witness. It remains for a trial jury to hear the evidence and to decide whether it is sufficient to support the corrupt motive charged. The allegations in the indictment are sufficient to withstand this motion to dismiss. Cf. *Cole v. United States,* 329 F.2d 437 (9th Cir.), *cert. denied,* 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964). The motion is denied.

6. *IRS failure to follow own regulations with respect to pre-indictment conferences*

■ The defendants who are charged in each of the tax evasion counts included in Indictment 73 Cr. 614 (Stofsky: 25–26; Hoff: 27, 31; Gold: 32–33), move to dismiss each tax count on the grounds that each was not afforded a pre-indictment conference as required by IRS Regulations, 26 C.F.R. § 601.-107(b)(2).

This Court is persuaded by the opinion in *United States v. Goldstein,* 342 F.Supp. 661 (E.D.N.Y.1972), that this regulation does not grant to prospective defendants rights so fundamental as to require dismissal of the indictment for failure to afford such conferences. The regulation itself contains a caveat in the event that there are compelling reasons to the contrary. The motions are denied.

7. *Venue for the tax evasion counts*

■ Defendants Hoff and Gold assert that they did not reside in the Southern District of New York during the times alleged in the tax evasion counts against them, nor did they file their returns in this District. For this reason, they move for dismissal of Counts 27, 31 and 32–33, respectively.

The government asserts that the gravamen of the offense is the act or acts of evasion and that venue will lie where these acts occurred. This Court agrees. 26 U.S.C. § 7201; *United States v. Albanese,* 117 F.Supp. 736 (S.D.N.Y.1954). Cf. *Spies v. United States,* 317 U.S. 492, 499–500, 63 S.Ct. 364, 368, 87 L.Ed. 418, 423 (1943). It remains for the government to prove at trial that acts of evasion were either commenced, continued or completed in the Southern District of New York.

### B. THE DISCOVERY MOTIONS

1. *Electronic Surveillance, and Searches and Seizures.*

Each defendant has requested a government inquiry with respect to possible electronic surveillance, court authorized or not; and with respect to searches and seizures in their homes and offices, court authorized or not. This request, which is contained in Point IV of the defendants' motion dated July 18, 1973, is repeated verbatim from defendants' Point V contained in the original pre-trial motions dated May 23, 1973, directed at the superceded indictment, 73 Cr. 257. At a June 27, 1973, pre-trial conference with respect to the superseding indictments and their effect on the then pending motions, this Court stated that unless it heard to the contrary from the government, it would assume that the new indictments did not change anything with respect to these requests and that the government was at that time proceeding with the investigations. The Court has not heard to the contrary. Five months have passed. If the government has not yet reported the results of its investigations to the defendant, it is ordered to do so forthwith, with a copy to the Court.

2. *Exculpatory material*

■ There is no right to pre-trial discovery of this material, but, as the Court stated at the June 23, 1973, conference,

it is assumed that the government is aware of its responsibilities under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny, and will comply.

3. *Discovery pursuant to Fed.R.Crim.P. 16*

■ This Court generally adheres to the government's position with respect to the discovery motions made as to both indictments, on the assumption, as stated above, that the government is aware of its duty under *Brady v. Maryland, supra,* under 18 U.S.C. § 3500. Additional requests call for revelation of the government's case which the government is not bound to disclose under Fed.R.Crim.P. 16(b), the defendants not having made a showing of materiality or reasonableness. Therefore, defendants' requests for discovery are granted to the extent that the government has consented and denied to the extent that the government has opposed with the following exception:

In light of *United States v. Baum,* 482 F.2d 1325, 2d Cir., 1973, the government is directed to answer the following question with respect to each indictment:

Does the government plan to attempt to utilize witnesses who will testify to other "racketeering activities" on the part of the defendants which are not charged in either indictment?

If so, the government is directed to respond with the name and address of any such witness or witnesses. The government may, of course, apply for an appropriate protective order pursuant to Fed.R.Crim.P. 16(d).

As for defendants' requests for the names and addresses of all government witnesses, this Court agrees with Judge Tenney who in *United States v. Maurino,* Unreported Memo., 70 Cr. 999, S.D.N.Y., Aug. 22, 1973, limited *Baum* to its facts.

## C. BILLS OF PARTICULARS

The defendants named in the two indictments have requested extensive bills of particulars with respect to each indictment, pursuant to Fed.R.Crim.P. 7(f).

The government has responded by consenting to provide certain of the items requested, and by opposing others. As to the requests which the government has opposed, they are denied, with the following exceptions, comments and reservations:

*73 Cr. 614* (Taft-Hartley indictment)

¶ 1. In view of the discrepancy between the dates alleged in Point 1 and Point 5(a) of Count 1, the government is directed to state the month and year the alleged conspiracy ended.

■ ¶ 7. With respect to Count 1 (the conspiracy count) defendants have requested notice as to whether or not the government will contend that the defendants [conspired to engage] in any "pattern of racketeering" aside from the acts specified in Counts 2–22 (the substantive Taft-Hartley violations) which are, presently, set forth as the sole underlying predicates for the racketeering objective of the conspiracy. This Court agrees that if the government could allege additional and/or entirely different criminal predicates, as additional bases for a racketeering objective, the defendants would have a right not to be surprised by such assertions. However, in this Court's view, the government is limited by the terms of the indictment to proof concerning the predicate acts specifically set forth in Point 4 of the conspiracy count. Defendants' request is therefore unnecessary and on this basis denied.

¶ 24(d). With respect to count 23 (the substantive racketeering count) the defendants have requested notice as to whether or not any acts, other than those incorporated by reference (the independent acts charged in counts 2–17), will be alleged as predicate criminal acts. As noted in response to request ¶ 7, the government will be limited, to those predicate acts explicitly set forth in the indictment and therefore defendants' request is denied.

¶ 26. The government opposes the defendants' request for notice as to wheth-

er or not an audit was conducted with respect to the tax returns involved in counts 25–27 and 31–33 (there is no count 28, 29, or 30 in the indictment). The government is not required to answer this question, but it should be noted that the government's agreement to request ¶ 10 of the discovery portion of the motion will most likely provide the answer.

*73 Cr. 615* (the Hobbs Act indictment)

¶ 8. The defendants request information as to additional unidentified predicates for the substantive racketeering charge contained in Count 2. Presumably they intend the same request with respect to the racketeering objective set forth in the conspiracy count (Count 1). As more fully explained in the Court's response to ¶¶ 7 and 24(d) directed at 73 Cr. 614, these requests are unnecessary in that the government will be held to the terms of the indictment with respect to criminal predicates for racketeering offenses, whenever they are alleged. Defendants' requests are, on that basis, denied.

In ¶¶ 5, 9, 15, 16, 34, 35, 36, 38, and 44, defendants request particulars aimed at eliciting from the government details with respect to the alleged extortion and coercion violations which underlie a good portion of Indictment 73 Cr. 615. The government has consented to ¶¶ 15 and 16. The remainder of these requests are held in abeyance pending receipt of the government's response to the issues as outlined by the Court herein at § A, 2, and further action with respect to the motion to dismiss Indictment 73 Cr. 615.

\* \* \* \* \* \*

The motions to dismiss are granted, or denied, or held in abeyance as indicated herein. The government is directed to provide the particulars and discovery granted herein, and to the extent it has not yet been provided, the particulars and discovery to which it consented last August. Such disclosures should be made forthwith, but in no event later than January 4, 1974. The government is requested to provide the Court with a copy of these disclosures, on January 4, 1974. On the same date, the government should file its response to the issues raised by the Court herein at § A, 2.

Trial of Indictment 73 Cr. 615 is presently scheduled to commence February 11, 1974, at 9:30 a. m., with trial of 73 Cr. 614 to commence immediately thereafter. Indictment 73 Cr. 616, against the union shop for manufacturers for violations of the Taft-Hartley law, will follow. The trial of the civil case against the union defendants, 73 Civ. 1258, is adjourned *sine die.*

SO ORDERED.