Argued and submitted May 5, reversed and remanded October 11, 1989,
reconsideration denied January 5, petition for review pending 1990

COMPUTER CONCEPTS, INC.
PROFIT SHARING PLAN et al,
*Appellants,*

*v.*

BRANDT et al,
*Respondents.*

(A8612-07746; CA A48504)

780 P2d 249

Richard S. Yugler and Robert J. McGaughey, Portland, argued the cause for appellants. With them on the briefs were Merten & Yugler and McGaughey & Kelley, Portland.

Susan K. Eggum, Portland, argued the cause for respondents William D. Brandt, Marc McDevitt and Peter C. Murphy. With her on the brief were McEwen, Gisvold, Rankin & Stewart, Richard M. Layne, Barbara J. Gazeley, Richard Baroway, Garvey, Schubert & Barer, Peter J. Burger and Hanna, Murphy, Jensen & Holloway, P.C., Portland.

Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, James J. McLaughlin, Assistant Attorney General, and Richard D. Wasserman, Assistant Attorney General, Salem, filed a brief *amicus curiae* for the State of Oregon.

Robert Udziela and David Gernant, Portland, filed a brief *amicus curiae* for the Oregon Trial Lawyers Association.

No appearance by respondents McDevitt & Company Investment Corporation, Paragon, Inc., American Insurance Co. and John Does 1-6.

Before Buttler, Presiding Judge, and Joseph, Chief Judge, and Warren, Judge.

WARREN, J.

**WARREN, J.**

In this action plaintiffs alleged, *inter alia,* violations of Oregon securities law and the Oregon Racketeer Influenced and Corrupt Organization Act. ORS 166.715 to ORS 166.735 (ORICO). Plaintiffs appeal from a summary judgment on the Oregon securities law claims and the dismissal of the ORICO claim. We reverse and remand.

Plaintiffs' first complaint included two claims alleging an unlawful sale of securities under ORS 59.115 and one claim alleging a violation of ORICO.[1] The trial court granted defendants' motions to dismiss the ORICO claim. Plaintiffs filed an amended complaint, and defendants moved to strike the ORICO claim and to dismiss with prejudice. The trial court granted those motions and granted plaintiffs leave to replead the other claims.

On July 30, 1987, plaintiffs filed a second amended complaint. On January 22, 1988, defendants Brandt, Peter C. Murphy and McDevitt filed a joint motion for summary judgment on two grounds. First, they contended that the securities claims had been released or barred by *res judicata* and, second, that plaintiffs did not allege the sale of a security.[2] The trial court denied the motion on the asserted basis that the claims had been released or barred but granted partial summary judgment, because the underlying transaction was not the sale of a security. On April 29, 1988, the court entered a final judgment that incorporated all previous orders and disposed of all of plaintiffs' claims for relief.

Defendants do not cross-appeal, but they cross-assign as error the trial court's denial of their motion for summary judgment that was based on the contention that the claims had been released or barred. Because granting their summary judgment motion would effectively terminate the case, we will discuss the cross-assignment of error first.

■     In this case, there are disputed facts. Defendants

---

[1] Plaintiffs alleged various other claims whose dismissal plaintiffs do not appeal. This summary of procedural history only refers to allegations, motions and orders that address the securities and racketeering claims.

[2] Other summary judgment motions by defendant were granted, and plaintiffs do not assign error to them.

argue that plaintiffs entered into a release of all claims with Michael Murphy and Michael Murphy Productions and accepted a confession of judgment from Michael Murphy Productions. Defendants also contend that all of the defendants in this lawsuit were agents and privies of Michael Murphy Productions, so that plaintiffs are bound by the release or barred by *res judicata* from further litigating any related claims. Plaintiffs dispute the existence, scope and intent of any release. More importantly, they allege that defendants are liable as independent tortfeasors under ORS 59.115(3),[3] even though they may have been agents or privies of Michael Murphy Productions. If defendants have independent liability, then whether joint tortfeasors are released depends on the intent of the parties. *Cranford v. McNiece,* 252 Or 446, 450 P2d 529 (1969). The determination of independent liability and the intent of the parties regarding the release are fact questions.

■　Additionally, when liability is joint, if all joint debtors do not unite in a confession of judgment, the judgment is not a bar to an action against the other joint debtors on the same demand. ORCP 73(D). Because the confession of judgment only expressly bound Michael Murphy and Michael Murphy Productions, it would not preclude an action against the other defendants, if they have independent liability. That is the same fact-bound determination. It was not error to deny defendants' motion.

■　Plaintiffs' first assignment of error is that the trial court erred in granting summary judgment to defendants on the ground that the transaction on which plaintiffs based their securities claims did not involve a security. We hold that the record on summary judgment contains sufficient evidence to demonstrate that there is a question of fact concerning whether the transaction was a security.

The transaction involved a loan agreement in 1985 between plaintiffs and Michael Murphy and Michael Murphy Productions (borrowers). Plaintiffs agreed to lend borrowers $200,000 at a fixed interest rate, payable within ninety days

---

[3] Under ORS 59.115(3), one who "participates or materially aids" in the sale of a security and one who directly or indirectly controls a seller have joint and several liability for an unlawful sale under ORS 59.115(1).

from the date of the agreement. As security for the loan, borrowers agreed to assign all of their right, title and interest in certain real property to plaintiffs. In addition to the return of principal and fixed interest, paragraph 3 of the agreement gave plaintiffs the choice either receiving two and one-half percent of the gross sales price of the video cassette rights from borrowers' planned feature film, entitled "Nick Carter" or "Killmaster and the Athos Society" ("Killmaster"), or receiving one percent of the sales of video rights and of converting the $200,000 loan principal and interest into equity in "Killmaster." Plaintiffs would receive no more than 49% of the film equity.[4]

Plaintiffs argue that the agreement is an "investment contract" within the definition of "security" under *former* ORS 59.015(14)(a):[5]

---

[4] Paragraph 3 of the Loan Agreement states, in relevant part:

"3. *ADDITIONAL CONSIDERATIONS:* As additional consideration for this loan, Lender shall have the following options which Lender may select in its sole discretion:

"(A) Lender may elect to receive from Borrower two and one-half percent (2 1/2%) of the total gross sales price of all video cassette rights worldwide from Borrower's next feature film, *Killmaster and The Athos Society.* If this option is elected, payment or payments will be made no later than ten (10) days after receipt by Borrower of the sales proceeds above referenced; OR

"(B) Lender may receive one percent (1%) of the equity in the above referenced film and one percent (1%) of the total gross sales price of all video cassette rights worldwide. This sum shall be payable pursuant to the same terms as specified in alternative (A) above.

"The election of either alternative (A) or (B) does not discharge nor forgive the principal and interest indebtedness specified above.

"Lender shall further have the option to convert the $200,000.00 principal sum together with the accrued interest thereon into equity in the above-referenced film. In the event Lender exercises this option, the amount of equity in the film due Lender will be determined by applying the total amount of interest and principal as the numerator and the total budget of the film as the denominator. Lender shall then receive the forty-nine percent (49%) equity interest in the film, the fractional proportion thereof represented by the above equation. In that regard, it is agreed and understood by all parties hereto that the equity interest holders in the film receive forty-nine percent (49%) of the profits from the film. The election of this alternative by Lender shall not affect his right to receive one percent (1%) of the gross sales price of the total worldwide video cassette rights as specified in alternative (B) above. This option must be exercised at the completion of the ninety (90) day loan period and will waive all interest and principal requirements due after the ninety (90) day period. Borrower agrees to provide two reports per month during the ninety (90) day period from the date of this agreement."

[5] ORS 59.015 was amended in 1987; the current definition of a security is found in ORS 59.015(16)(a). The only amendment to present ORS 59.015(16)(a) does not affect this issue.

" 'Security' means a note, * * * evidence of indebtedness, certificate of interest or participation in a * * * profit-sharing agreement, *investment contract*, * * * or *right to subscribe to or purchase any of the foregoing.*" (Emphasis supplied.)

In interpreting the Oregon definition of "investment contract," the Supreme Court has adopted the so-called "*Howey*[6] test":

"(1)  An investment of money (or money's worth),

"(2)  in a common enterprise,

"(3)  with the expectations of a profit,

"(4)  to be made through the management and control of others." *Pratt v. Kross,* 276 Or 483, 497, 555 P2d 765 (1976).[7]

Defendants argue that the facts do not fit the test. They contend that the transaction was not an investment because, at the time when the agreement was signed, the right of plaintiffs to return of the principal with interest after ninety days was absolute and was not dependent on an expectation of profit to be made through the management and control of others. They argue that the option in the agreement

---

[6] *Securities and Exchange Com. v. Howey Co.,* 328 US 293, 298-99, 66 S Ct 1100, 90 L Ed 1244 (1946).

[7] In *Pratt v. Kross, supra,* the Supreme Court followed *United Housing Foundation, Inc. v. Forman,* 421 US 837, 852, 95 S Ct 2051, 44 L Ed 2d 621 (1975), in modifying the *Howey* test, using the analysis in *SEC v. Glenn W. Turner Enterprises, Inc.,* 348 F Supp 766 (D Or 1972), *aff'd* 474 F2d 476 (9th Cir), *cert denied* 414 US 821 (1973). The modification avoided the harsh result of the original test, which required the expectation of profit to arise "solely from the efforts of others," changing that prong of the test to require an expectation of profit "to be made through the management and control of others." *Pratt v. Kross, supra,* 276 Or at 497.

We addressed that issue in *State v. Consumer Business System,* 5 Or App 19, 25, 482 P2d 549 (1971), adopting an alternative test for an investment contract, the "risk capital test," precisely in order to avoid the limitations of the *Howey* test. In *Consumer Business System,* the investor had been a franchisee who participated in the enterprise and could not allege that profits were to be derived "solely through the efforts of others." The "risk capital test" adopted in *Consumer Business System* allowed the investor to play a role in the enterprise, limited only in that "the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise." 5 Or App at 25.

Modification of the *Howey* test has reduced the need for the alternative test, and no Oregon appellate court has since relied on the "risk capital" test. In *Pratt v. Kross, supra,* the Supreme Court described, but did not rely on, the "risk capital" test. In *Black v. Corporation Division,* 54 Or App 432, 634 P2d 1383 (1981), we first analyzed the transaction under the *Howey* test and then listed the elements of the "risk capital" test and simply stated that the transaction also met the "risk capital" test.

presented no risk to plaintiffs unless and until plaintiffs chose to exercise it and that, without a risk, the transaction was not an investment.

Although ORS 59.015(14)(a) includes "note" within the definition of a security, the transaction must be evaluated in the light of the "economic realities," *Black v. Corporation Division, supra* n 7, 54 Or App at 442, to determine whether the agreement was an investment contract or an ordinary commercial transaction. *See Bergquist v. Int'l Realty Ltd.,* 272 Or 416, 427, 537 P2d 553 (1975).

The Supreme Court has held that a secured note plus an option to convert the note into shares in a corporation is a security. In *Foelker v. Kwake,* 279 Or 379, 568 P2d 1369 (1977), the plaintiff had given the borrower $6,000, the borrower had issued a note for $6,000 and signed an "inventory loan and security agreement" to secure the loan, and the plaintiff and the borrower had agreed that the plaintiff would pay $9000 more a few months later and receive a fifty percent interest in one corporation and 20 to 25 percent interest in another in return for the $15,000. The plaintiff argued that the $6000 was an investment and that the note and security agreement had been issued to give him "the option to back out if he wanted to" and to "be paid my money back with interest." The defendant argued that

> "[a] loan of $6000 was made and an agreement was entered whereby *the Plaintiff received basically an option to buy shares in the corporation* after he had made an investigation of the corporation. * * * *Basically there was a loan and an option.*" 279 Or at 383. (Emphasis in original.)

The Supreme Court agreed with the defendant's "analysis and characterization of the transaction as basically an option to buy shares in the corporation" and held that, because the purchase of shares involves a security and an option to purchase a security is also a security, the transaction was within the securities law definition. 279 Or at 383-84. The court thus avoided an investment contract analysis.

Defendants in this case argue that *Foelker* does not apply, because the plaintiff there intended to invest and the loan did not have a time limit, while in this case plaintiffs

intended to avoid risk and had the right to receive their principal and interest after 90 days. Regardless of whether plaintiffs intended to avoid any risk, the transaction must be evaluated by the economic realities. *Black v. Corporation Division, supra.* The loan in this case gave plaintiffs the opportunity to purchase an equity interest in a movie enterprise and as such is indistinguishable from the "loan" in *Foelker* that allowed the plaintiff the opportunity to own a piece of a corporation. The existence of the option to purchase equity gives the agreement the economic character of an investment, with the right to share in the profits of the venture.

Plaintiffs also argue that the section of the agreement giving them a percentage of the sale of video rights created a security. The percentage is a share of the video profits. This type of arrangement, which fits the definition of a "royalty,"[8] has not been analyzed under ORS 59.015. Federal courts have found the sale of royalty interests of as little as one percent to be securities under federal securities laws. *United States v. Schaefer,* 299 F2d 625 (7th Cir 1962) *cert den* 370 US 917; *Trostle v. Nimer,* 510 F Supp 568 (SD Ohio 1981); *Nicewarner v. Bleavins,* 244 F Supp 261 (D Colo 1965).[9] In each of those cases, all of the money exchanged was used to purchase the royalty, while in this case the royalty was only one component of a larger transaction. However, that distinction does not alter the fact that plaintiffs were purchasing a right to a share of the profits, making this aspect of the transaction an investment. Both the option and the royalty aspects of the agreement show that it satisfies the "investment" and "expectation of profit" elements of the investment contract test, which also requires that the expected profit be made through "the management and control of others." Plaintiffs argue that the deposition of McDevitt, which is part of the summary judgment record, shows that plaintiffs were not to play a role in managing or developing the movie. Defendants do not offer any evidence that plaintiffs were to play such a role. A material issue of fact exists whether the expectation of profit was to come through "the management and control of others."

The "common enterprise" prong has two different

---

[8] *See Black's Law Dictionary* 1195 (5th ed 1979).

[9] Interpretation of federal law is persuasive in analyzing the definition of "investment contract" under ORS 59.015. *See* n 7, *supra.*

definitions in the federal courts, neither of which has been expressly adopted by Oregon. The more stringent definition, "horizontal commonality," requires a pooling of money by more than one investor. In contrast, "vertical commonality" requires only one investor and that "the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Brodt v. Bache & Co., Inc.,* 595 F2d 459, 460 (9th Cir 1978), *cited with approval* in *Black v. Corporation Division, supra,* 54 Or App at 441-42.

In *Pratt v. Kross, supra,* the Supreme Court held that, under the *Howey* test, one investor's limited partnership in a business was an investment contract. Although the court did not expressly discuss "vertical commonality," it held that the fraud provisions of the Oregon Securities Act apply to "purchasers in isolated transactions where there is no public sale or solicitation" and the transaction otherwise fits the definition of an investment contract. 276 Or at 483. In addition, in *Foelker v. Kwake, supra,* the Supreme Court held that one investor's loan with an option to purchase shares in a corporation was a security, although the court did not use an "investment contract" analysis. We hold that, under Oregon law, "vertical commonality" can prove a common enterprise.

Plaintiffs' uncontroverted allegations show that the success of their investment was "interwoven with and dependent upon" the efforts and the success of borrowers and third parties, the elements necessary for "vertical commonality." The record on summary judgment does not show that there was no "common enterprise."

The summary judgment record does not show that, as a matter of law, the agreement was not a security. The trial court erred in granting summary judgment to defendants.

Plaintiffs also assign as error the court's grant of defendants' motions to strike and to dismiss with prejudice plaintiffs' ORICO claim in their first amended complaint. Plaintiffs state that the ground for dismissal was that plaintiffs did not allege racketeering activity.

Defendants first respond that plaintiffs have not properly assigned error to the court's ruling, arguing that defendants' motion was based on two independent grounds,

the absence of allegations of racketeering activity and the absence of allegations of a pattern of racketeering. They contend that plaintiffs have only argued that the court erred on one ground, absence of racketeering activity, and that the court granted the motion to strike on both grounds. They conclude that, because the court held that there was an absence of allegations of a pattern of racketeering and plaintiffs did not challenge that ruling, they have lost the claim.

In fact, the issue on which the court ruled was whether plaintiffs had failed to state an ORICO claim. Regardless of the way that defendants phrased their motion or the way that plaintiffs have assigned the court's action as error, the issue remains whether plaintiffs stated an ORICO claim, and they have properly challenged the ruling that they did not.

Plaintiffs base their claim on ORS 166.720(1) through ORS 166.720(3),[10] which describe unlawful acts carried out through a "pattern of racketeering activity," which is defined in *former* ORS 166.715(3), now ORS 166.715(4). "Racketeering activity" is defined in *former* ORS 166.715(5), now ORS 166.715(6). Both definitions must be met to state a valid claim under ORS 166.720.

This is a case of first impression about ORICO definitions of "racketeering activity" and "pattern of racketeering." *Former* ORS 166.715(5) provides, in part:

"(5) 'Racketeering activity' means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce or intimidate another person to commit:

"(a) Any conduct which constitutes a crime, as defined

---

[10] ORS 166.720 provides:

"(1) It is unlawful for any person who has knowingly received any proceeds derived, directly or indirectly, from a pattern of racketeering activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest or equity in, real property or in the establishment or operation of any enterprise.

"(2) It is unlawful for any person, through a pattern of racketeering activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any real property or enterprise.

"(3) It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt."

in ORS 161.515, under any of the following provisions of the Oregon Revised Statutes:

"* * * * *

"(b) Any conduct defined as 'racketeering activity' under 18 U.S.C. § 1961 (1)(B), (C) and (D)."

The statute does not expressly state that a criminal conviction is necessary in order to establish civil liability. During the 1981 hearings on the ORICO bill, Attorney General Frohnmayer pointed out that civil cases would be useful for developing evidence for criminal cases that might follow.[11] A nationally recognized federal RICO expert, Professor Robert Blakey, also testified that criminal prosecutions have followed civil actions under the federal law.[12]

Interpretations of the federal RICO statute are useful for guidance, keeping in mind the areas where Oregon has deliberately and significantly departed from it. *See State v. Blossom,* 88 Or App 75, 744 P2d 281 (1987), *rev den* 305 Or 22 (1988). Before the enactment of ORICO, a majority of federal circuits considering the issue had held that no prior criminal conviction was required for any RICO action.[13] In 1985, the United States Supreme Court agreed that a private civil RICO action under 18 USC § 1964(c) does not require proof of a prior conviction. *Sedima S.P.R.L. v. Imrex Co., Inc.,* 473 US 479, 105 S Ct 3275, 87 L Ed 2d 346 (1985).

Defendants interpret the Oregon "racketeering activity" definition ("any conduct which constitutes a crime") to mean that the conduct must first be adjudicated as criminal. In *Sedima S.P.R.L. v. Imrex Co., Inc., supra,* the Court reviewed the language of 18 USC § 1961(1), noted the lack of the word "conviction" and held that language describing "conduct that is 'chargeable' or 'indictable,'" and "'offense[s]' that are 'punishable'" does not require a prior conviction. 473 US at 488. The comparable Oregon provision describing "conduct that constitutes a crime" similarly focuses on the conduct and not conviction of the crime. The

---

[11] *See* Minutes, Joint Subcommittee on Organized Crime, April 23, 1981, at 14.

[12] *See* Minutes, n 11 *supra,* at 12-13.

[13] *See, e.g., United States v. Capetto,* 502 F2d 1351, 1357 (7th Cir 1974), *cert den* 420 US 925 (1975) (civil); *United States v. Malatesta,* 583 F2d 748, 757 (5th Cir 1978), *cert den* 444 US 846, 440 US 962 (1979) (criminal).

Court in *Sedima* also examined the policy considerations and remedial purpose of RICO. The Oregon statute has a similar remedial purpose and is to be liberally construed. ORS 166.735. We find nothing in the language or the legislative history of the Oregon statute that would suggest a departure from the meaning of the federal law. We hold that a conviction for an underlying predicate criminal act is not required in order to allege "racketeering activity" under ORS 166.715(5)(a).

The term "pattern of racketeering" is defined in *former* ORS 166.715(3):

> " 'Pattern of racketeering activity' means engaging in at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise, and are not isolated incidents, provided at least one of such incidents occurred after November 1, 1981, and that the last of such incidents occurred within five years after a prior incident of racketeering activity."

Defendants first argue that plaintiffs must allege at least two incidents of racketeering and that they have alleged one, at most. Plaintiffs allege four sales of investments in Murphy Productions Co., Inc., or the Nick Carter Project, one to plaintiff Computer Concepts Pension Plan, one to plaintiff Computer Concepts Profit Sharing Plan, one to Marc McDevitt and one to John Does 7 and 8. The transaction with the two plaintiffs involved one contract signed for both plaintiffs by one trustee and constitutes only one incident. Defendants argue that plaintiffs are estopped from alleging a sale to McDevitt because, in paragraph 12(J) of the amended complaint, plaintiffs allege that defendants misrepresented that "McDevitt had $200,000 of his own money in the Nick Carter project." We do not agree that that allegation states that McDevitt did not invest at all, as defendants argue. Defendants also contend that the allegation regarding John Does 7 and 8 gives no details or dates. For the purpose of alleging more than one incident, those allegations, combined with the alleged sales to plaintiffs and McDevitt, are sufficient to survive a motion to dismiss for failure to state a claim.

Defendants also argue that the lack of detail regarding the alleged sales to McDevitt and the John Does make

those sales insufficient to form a "pattern," as defined by the statute. They contend that plaintiffs have not alleged a "threat of continuing activity," which defendants argue is an element of the "pattern" definition.

The United States Supreme Court has construed the federal definition of "pattern of racketeering," 18 USC § 1961(5), to include two or more acts that are related to each other and that constitute a threat of continuing racketeering activity. *H.J. Inc. v. Northwestern Bell Telephone Co.,* ___ US ___, 109 S Ct 2893, 106 L Ed 2d 195 (1989).

The federal definition does not expressly mention the continuity and relationship elements:

> " '[P]attern of racketeering activity' *requires* at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years * * * after the commission of a prior act of racketeering activity[.]" 18 USC § 1961(5). (Emphasis supplied.)

The Court found that the use of the word "requires," instead of "means," in the definition reflected an intention by Congress that a minimum of two acts of racketeering is required but that the two acts are not necessarily sufficient to show a pattern and that the elements of relationship and continuity were also needed. ___ US at ___, 106 L Ed 2d at 208. As the Court said in *Sedima, S.P.R.L. v. Imrex Co., supra:*

> "[T]he definition of a 'pattern of racketeering activity' differs from the other provisions in [18 USC] § 1961 in that it states that a pattern '*requires* at least two acts of racketeering activity,' § 1961(5) not that it '*means*' two such acts. The impliction is that while two acts are necessary, they may not be sufficient." 473 US at 496 n 14. (Emphasis supplied.)

The Oregon statute, formerly ORS 166.715(3), now ORS 166.715(4), differs significantly from the federal, using the word "means" instead of "requires" and adding a description of the "relationship" element:

> " 'Pattern of racketeering activity' *means* engaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise, and

are not isolated incidents, provided at least one of such incidents occurred after November 1, 1981, and that the last of such incidents occurred within five years after a prior incident of racketeering conduct." (Emphasis supplied.)

The use of "means" suggests that the definition is complete. The express description of "interrelated" incidents, which is lacking in the federal statute, suggests that the legislature chose to include the element of "relationship" and exclude "continuity."

■     We cannot ignore the plain meaning of unambiguous words in a statute. We hold that the "pattern of racketeering" element in an ORICO claim is satisfied by two incidents of "racketeering activity," interrelated as defined in ORS 166.715(4), provided that the incidents were not isolated and occurred within five years of each other. The "continuity" element in the RICO statute is not an element under ORICO.

■     Plaintiffs allege that the sale to plaintiffs consisted of racketeering activity and that the same enterprises made sales to McDevitt and the John Does in the same or similar manner as the sales to plaintiffs. Plaintiffs have alleged racketeering activity and a pattern of racketeering. Defendants do not argue that the incidents were isolated or more than five years apart. The trial court erred in striking and dismissing the ORICO claim.

Reversed and remanded.