Argued and submitted May 2, the decision of the Court of Appeals affirmed and the judgment of the circuit court reversed and remanded for further proceedings November 26, 1990

COMPUTER CONCEPTS, INC., PROFIT SHARING PLAN; and Computer Concepts, Inc., Pension Plan, succeeded in interest by Don Weidenweber, by and through its custodian, Piper Jaffray & Hopwood, Incorporated,
*Respondents on Review,*

*v.*

William D. BRANDT;
Marc McDevitt; McDevitt & Company Investment Corporation; Peter C. Murphy; and American Insurance Company,
*Petitioners on Review,*

*and*

PARAGON, INC.,
and John Does 1-6,
*Respondents (below).*

(CC A8612-07746; CA A48504; SC S36747)

801 P2d 800

Susan K. Eggum, of McEwen, Gisvold, Rankin & Stewart, Portland, argued the cause for petitioner on review William D.

Brandt. With her on the petition for review and reply brief were the following counsel for the other petitioners on review.

Richard M. Layne, of Garvey, Schubert & Barer, Portland, argued the cause for petitioners on review Marc McDevitt, McDevitt & Company Investment Corporation, and American Insurance Co. With him on the petition for review was Richard Baroway, Portland.

Kevin P. O'Connell, of O'Connell & Goyak, Portland, argued the cause for petitioner on review Peter C. Murphy. On the petition for review and reply brief was Eric M. Bosse.

Richard S. Yugler, Portland, and Robert J. McGaughey, of O'Donnell, Ramis, Elliot & Crew, Portland, argued the cause for respondents on review and filed the response to the petition.

James J. McLaughlin, Assistant Attorney General, Salem, filed a brief on behalf of *amicus curiae* Department of Justice of the State of Oregon. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Peterson, Chief Justice, Carson, Gillette, Van Hoomissen, Fadeley, and Unis, Justices, and Graber, Justice pro tempore.

GRABER, J.

## GRABER, J.

This case arises under the Oregon Securities Law, ORS 59.005 to 59.370, and the Oregon Racketeer Influenced and Corrupt Organization Act, ORS 166.715 to 166.735 (ORICO).[1] The trial court granted summary judgment to defendants on the securities law claim, on the ground that the transaction did not involve the sale of a security.[2] The court also dismissed plaintiffs' ORICO claim with prejudice, apparently because they did not allege criminal convictions as predicate acts and because they did not allege "continuity" of defendants' enterprise.[3]

The Court of Appeals reversed, holding that there is an issue of fact, ORCP 47, whether the transaction involved the sale of a security and that plaintiffs adequately pleaded their ORICO claim. *Computer Concepts, Inc. v. Brandt,* 98 Or App 618, 780 P2d 249 (1989). Defendants petitioned for review. We affirm the decision of the Court of Appeals.

With respect to the summary judgment in defendants' favor on the securities claim, we state the facts that were before the trial court in the light most favorable to plaintiffs. *Seeborg v. General Motors Corporation,* 284 Or 695, 699, 588 P2d 1100 (1978). With respect to the ORICO claim, we take the pleaded facts as true, because the trial court dismissed the claim. *Sager v. McClenden,* 296 Or 33, 35, 672 P2d 697 (1983).

On February 12, 1985, plaintiffs entered into an agreement with Michael T. Murphy and Michael T. Murphy Productions (MMP) for the financing of a proposed movie. Under the agreement, plaintiffs would lend $200,000 to Murphy and MMP, who agreed to repay that amount, plus interest

---

[1] Plaintiffs also alleged other claims, which the trial court dismissed. Those claims are not at issue on review.

[2] The trial court denied the motion for summary judgment on the other ground that defendants asserted, which was that a release or principles of claim preclusion barred the claim. The Court of Appeals held that the trial court did not err in denying that part of the motion, because issues of fact remained. Defendants did not petition for review of that issue.

[3] The parties disagree about the basis for the trial court's ruling. Both issues, convictions and continuity, were argued to the trial court, but we find nothing in the record that shows which theory or theories the court chose. Both issues also were argued to and decided by the Court of Appeals.

at the prime rate plus two percent, in 90 days. As security for the loan, Murphy and MMP agreed to assign all of their "right, title and interest" in certain real property in Portland. The agreement also contained these paragraphs:

"3. *ADDITIONAL CONSIDERATIONS* [*sic*]: As additional consideration for this loan, Lender shall have the following options which Lender may select in its sole discretion:

"(A)  Lender may elect to receive from Borrower two and one-half percent (2 1/2%) of the total gross sales price of all video cassette rights worldwide from Borrower's next feature film, *Killmaster and The Athos Society.* If this option is elected, payment or payments will be made no later than ten (10) days after receipt by Borrower of the sales proceeds above referenced: OR

"(B)  Lender may receive one percent (1%) of the equity in the above referenced film and one percent (1%) of the total gross sales price of all video cassette rights worldwide. This sum shall be payable pursuant to the same terms as specified in alternative (A) above.

"The election of either alternative (A) or (B) does not discharge nor forgive the principal and interest indebtedness specified above.

"Lender shall further have the option to convert the $200,000.00 principal sum together with the accrued interest thereon into equity in the above-referenced film. In the event Lender exercises this option, the amount of equity in the film due Lender will be determined by applying the total amount of interest and principal as the numerator and the total budget of the film as the [denominator]. Lender shall then receive of the forty-nine percent (49%) equity interest in the film, the fractional proportion thereof represented by the above equation. In that regard, it is agreed and understood by all parties hereto that the equity interest holders in the film receive forty-nine percent (49%) of the profits from the film. The election of this alternative by Lender shall not affect his right to receive one percent (1%) of the gross sales price of the total worldwide video cassette rights as specified in alternative (B) above. This option must be exercised at the completion of the ninety (90) day loan period and will waive all interest and principal requirements due after the ninety (90) day period. Borrower agrees to provide two reports per month during the ninety (90) day period from the date of this agreement.

"* * * * *

"4. *ENTIRE AGREEMENT:* This document is the

entire, final and complete agreement of the parties and super-sedes and replaces all written and oral agreements heretofore made or existing by and between the parties or their represen-tatives insofar as the within-described loan is concerned."

The movie was never made. Murphy and MMP did not repay the principal or interest on the loan. In 1985, plain-tiffs obtained a confession of judgment from Murphy and MMP for $285,000. Later, plaintiffs obtained a judgment for that amount, which they were unable to collect. They then sued the present defendants, all of whom were involved in the movie transaction.

We first consider plaintiffs' claim that defendants engaged in securities fraud and in the sale of an unregistered security, ORS 59.115(1)(a) and (b), because their ORICO claim is predicated on those alleged violations of the securities laws. If, as a matter of law, the loan agreement was not, or did not contain, a security, then both of plaintiffs' claims would fail.

ORS 59.015(13)(a) (1983)[4] defined "security" to mean

"a note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in a pen-sion plan or profit-sharing agreement, collateral-trust certifi-cate, preorganization certificate or subscription, transferable share, *investment contract,* voting-trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such title or lease, or, in general, any inter-est or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificates for, receipt for, guarantee of, or warrant *or right to* subscribe to or *purchase any of the foregoing."* (Emphasis added.)

Plaintiffs argue that the loan agreement is an investment contract, because it contains an option to purchase an invest-ment, which is a security. As this court has held, an option to

---

[4] After the transaction at issue, that subsection was renumbered, as ORS 59.015(16)(a), and amended to add a definition that is not relevant to the present case. Or Laws 1987, ch 603, § 1. In 1989, the subsection was again renumbered, as ORS 59.015(17)(a), and amended in a way not relevant to the present case. Or Laws 1989, ch 197, § 1.

purchase a security is a security. *Foelker v. Kwake,* 279 Or 379, 384, 568 P2d 1369 (1977).[5] Therefore, if the loan agreement contains an option to purchase a security, the agreement contains a security.

■      Defendants respond that, even if one of the options contains a security, the loan agreement as a whole is not a security for two reasons. First, the options were not exercised. Second, defendants assert that the parties' overall intent was that the transaction be a loan, not an investment. Neither point is well taken.

The fact that the options were not exercised is irrelevant. The very nature of an option is to permit a future act, and, as we have noted, the legislature has manifested a consistent intention to regulate the sale of options. The system would be unworkable if it required registration by a seller only at the point when the buyer decides to exercise an already-purchased option. The question is whether an option, if exercised, would be a security.

Defendants' second argument relies principally on this passage in *Foelker v. Kwake, supra,* 279 Or at 384:

"We do not agree with defendants' contention that 'the existence of [the] option to purchase shares in the corporation [was] a completely separate transaction [as in *Union Land Associates v. Ussher,* 174 Or 453, 149 P2d 568 (1944), cited by defendants] and [therefore] did not cause the overall transaction to become an "investment contract.' " We hold that there

---

[5] In *Foelker v. Kwake,* 279 Or 379, 384, 568 P2d 1369 (1977), this court quoted from ORS 59.015(11)(a) (1975): " 'Sale' or 'sell' includes * * * option for the sale of * * * a security * * *." Although the word "option" was deleted from the definition of "sale" or "sell," Or Laws 1985, ch 349, § 1, the current definition in ORS 59.015(15)(a) provides in part:

" 'Sale' or 'sell' includes every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value. Any security given or delivered with, or as a bonus on account of, a purchase of securities or any other thing shall constitute a part of the subject of the purchase and shall have been offered and sold for value."

The amended wording retains in broad terms the concept of an option, and the legislative history shows no intention to omit options from the definition of "security." Moreover, the definition of "security" has continuously included a "right to subscribe to or purchase any of the foregoing" — when this court decided *Foelker,* when the statute governing the present transaction took effect, and now. ORS 59.015(13)(a) (1975); ORS 59.015(13)(a) (1983); ORS 59.015(17)(a) (1989). None of the later statutory changes affects the holding in *Foelker* that an option to purchase a security is a security.

was substantial evidence to support a finding that the payment of the $6,000, the issuance of the note, and the acquisition of the option were either integral parts of a single transaction or that the transactions were so closely related so as to support the finding of fact by the trial court that 'these transactions, including the issuance of a corporate note to the Plaintiff, constituted the sale of a security to the Plaintiff.' " (Brackets in original; footnote omitted.)

In *Foelker,* the plaintiff paid $6,000 to the defendants, who signed a promissory note. The plaintiff testified that there was also an oral agreement under which he was to receive an interest in two of the defendants' corporations, in return for an investment of $15,000, of which the $6,000 was a part. The option was not in writing and, *a fortiori,* was not an integral part of the promissory note. Therefore, there was an issue of fact whether the parties had entered into one transaction or two unrelated transactions. In contrast, here, the entire transaction is contained in one written agreement. Paragraph 3 of the agreement on its face states that the options listed there are "additional consideration for this loan," and paragraph 4 contains an integration clause. Consequently, in the present case, the options and the other loan terms are unambiguously "integral parts of a single transaction." *Ibid.*

■    We next consider whether any of the options in the loan agreement is a security. Plaintiffs focus on the provision that would have allowed them to convert the $200,000 principal, plus interest, into an equity interest in the film.[6] Our discussion also will center on that alternative.

■■    *Pratt v. Kross,* 276 Or 483, 555 P2d 765 (1976), dealt with a very similar contractual arrangement. There, this court held that a limited partnership was a security. A limited partnership has much in common with plaintiffs' right to acquire an equity interest in the film: the investment risk is limited to the amount of the investment, and management and control are in the hands of others. In *Pratt v. Kross, supra,* 276 Or at

---

[6] There is some dispute about what the word "equity" means in this contract. Both parties agree, however, that an "equity" interest encompasses, at a minimum, the right to share in the profits of the movie and excludes the right to a return of the $200,000 principal or interest on it.

497, this court adopted a modified *Howey* test[7] and analyzed the limited partnership under it. We will apply the same test to the present transaction. In order to establish that an agreement is an investment contract and, therefore, a security under the modified *Howey* test, plaintiffs must prove:

(1)  an investment of money (or money's worth),

(2)  in a common enterprise,

(3)  with an expectation of profit,

(4)  to be made through the management and control of others. *Pratt v. Kross, supra,* 276 Or at 497.

Here, the parties' agreement answers the first and third parts of the test. In order to exercise the option, plaintiffs would invest over $200,000 in exchange for a share of the profits of the proposed film. Defendants conceded in their memorandum in support of their motion for summary judgment and at oral argument in this court that MMP retained management control over the film; therefore, the fourth part of the test is also met.

■■  Accordingly, the only remaining question is whether defendants and plaintiffs were engaged in a "common enterprise." Federal courts have taken two differing views of what constitutes a common enterprise,[8] "horizontal" and "vertical" commonality. Horizontal commonality requires more than one investor and requires a pooling of investments. *Hart v. Pulte Homes of Michigan Corporation,* 735 F2d 1001 (6th Cir

---

[7] *SEC v. Howey Co.,* 328 US 293, 298-99, 66 S Ct 1100, 90 L Ed 1244 (1946), established what came to be called the *Howey* test to determine whether a transaction is an investment contract under federal securities law. Later cases modified that test to delete the requirement that the enterprise be managed and controlled "solely" by persons other than the investor. *E.g., SEC v. Glenn W. Turner Ent.,* 474 F2d 476, 481-82 (9th Cir), *cert den* 414 US 821 (1973); *Lino v. City Investing Co.,* 487 F2d 689, 692 (3d Cir 1973). This court adopted a modified *Howey* test, which we state in the text below, in *Pratt v. Kross,* 276 Or 483, 497, 555 P2d 765 (1976), to determine whether a transaction is an investment contract under the Oregon securities law. The definition of "security" under federal law is substantially the same as Oregon's and includes "investment contract." 15 USC § 77(b)(1) (1988). For that reason, we may look to federal cases for guidance in interpreting the meaning of "investment contract." *See Karsun v. Kelley,* 258 Or 155, 161, 482 P2d 533 (1971) (because ORS 59.115(1)(b) (1967) adopted "substantially the same terms" as 15 USC § 77(l)(2) (1933), "the legislative history of that act, as well as decisions construing its provisions, are of significant interest").

[8] As discussed in note 7, above, federal cases are instructive in this context.

1984); *Milnarik v. M-S Commodities, Inc.,* 457 F2d 274, 276-77 (7th Cir), *cert den* 409 US 887 (1972). The record in this case, as developed to this point, does not clearly demonstrate that there was a pooling of investments in the *Killmaster* movie project; that is, horizontal commonality has not been shown.

Vertical commonality has, in turn, been defined in more than one way. Some courts hold that the investor need prove only dependence on promoter expertise. *Taylor v. Bear Stearns & Co.,* 572 F Supp 667, 671 (ND Ga 1983); *Alvord v. Shearson Hayden Stone, Inc.,* 485 F Supp 848, 853 (D Conn 1980). Others require a showing that the investment is interwoven with and dependent on the fortunes of others, so that the investor and the promoter can be said to conduct a common venture. *Brodt v. Bache & Co., Inc.,* 595 F2d 459 (9th Cir 1978). A variation of the latter vertical commonality test requires that the fortunes of the investor and the promoter be intertwined as to both profit *and* loss. *Kaplan v. Shapiro,* 655 F Supp 336, 341 (SD NY 1987); *Mechigan v. Art Capital Corp.,* 612 F Supp 1421, 1427 (SD NY 1985). In the present case, as we discuss more fully below, plaintiffs' fortunes are intertwined with the promoter's so that both "[p]rofits and losses [are] to be apportioned between the parties," although plaintiffs' losses are limited to their contribution. *Pratt v. Kross, supra,* 276 Or at 485. The transaction, therefore, fits the most restrictive of the definitions of vertical commonality.[9]

This court has not expressly adopted a test for commonality. In *Pratt v. Kross, supra,* however, this court took the view that a one-on-one arrangement could qualify as a security. *Pratt* held that the fraud provisions of the Oregon securities law apply to "purchasers in isolated transactions where there is no public sale or solicitation," so long as the transaction otherwise fits the definition of an investment contract. 276 Or at 495. We now hold expressly what *Pratt* suggested implicitly: that in Oregon a plaintiff may prevail by showing vertical commonality, as an alternative to showing horizontal commonality.

Under the parties' agreement, plaintiffs had the option to trade their right to receive over $200,000 for an

---

[9] We need not decide whether any of the less restrictive alternatives might also suffice to establish a common enterprise under the vertical commonality test.

equity interest in the film. If they did not exercise the option, plaintiffs shared the promoters' risk of loss only in the sense that the repayment of any loan is at risk. The risk of nonpayment of a loan, without more, is not an investor's risk of loss, that is, a risk of loss of capital invested, because the right to a return of principal and interest is never at risk. In contrast, if plaintiffs had exercised the option, they would have shared the promoters' risk of loss to the extent of over $200,000; they would have given up the right to demand its return. Plaintiffs also would have shared the promoters' opportunity to make a profit from the film. That arrangement supplies the common enterprise element of the investment contract test, under a vertical commonality theory. Thus, there were facts in this record from which a trier of fact could conclude that the contract was an "investment contract" (and, hence, a security) under Oregon law.[10] The trial court erred in concluding to the contrary and in granting summary judgment to defendants.

Because the trier of fact could find that the transaction is a security and that defendants violated the Oregon securities law, we reach the ORICO issues. Plaintiffs base their claim on ORS 166.720(1) to (3), which provide:

"(1)  It is unlawful for any person who has knowingly received any proceeds derived, directly or indirectly, from a *pattern of racketeering activity* or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest or equity in, real property or in the establishment or operation of any enterprise.

"(2)  It is unlawful for any person, through a *pattern of racketeering activity* or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any real property or enterprise.

"(3)  It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a *pattern of racketeering activity* or the collection of an unlawful debt." (Emphasis added.)

---

[10] Because we hold that there is evidence to permit a trier of fact to find that the contract was an "investment contract" and that the trial court, therefore, erred in granting summary judgment to defendants, we need not decide whether the evidence in this record also would have permitted a trier of fact to find that the contract was a security under one or more of plaintiffs' alternative theories.

■    The first question is whether a prior criminal conviction for the allegedly actionable conduct is a necessary element of an ORICO claim. Defendants maintain that it is.

ORS 166.715(5) (1985)[11] defined "racketeering activity" to mean

"to commit, to attempt to commit, to conspire to commit, or to solicit, coerce or intimate another person *to commit:*

"(a)    *Any conduct that constitutes a crime,* as defined by ORS 161.515, under any of the following provisions of the Oregon Revised Statutes:

"[List of predicate offenses.]

"(b)    Any conduct defined as 'racketeering activity' under 18 U.S.C. § 1961 (1)(B), (C) and (D)." (Emphasis added.)

The statute points to "*conduct* that constitutes" certain specified crimes. (Emphasis added.) It does not refer to convictions or use the more common phrase, "to commit a crime." The statute, by its terms, requires a plaintiff to prove only that the defendant engaged in all of the elements of a listed crime, but not that the defendant was convicted.

Even if the statute were ambiguous, its legislative history fails to support defendants' suggested reading. During the 1981 hearings on the ORICO bill, witnesses testified that civil cases could be useful in developing evidence for possible criminal prosecutions to follow. Minutes, Joint Committee on Organized Crime, April 23, 1981, pp 12-14. Requiring a *prior* conviction would be exactly the opposite of what the witnesses who supported the bill had in mind. *See* ORS 166.735(2) (ORICO "shall be liberally construed to effectuate its remedial purposes"); *see also Sedima, S.P.R.L. v. Imrex Co.,* 473 US 479, 498, 105 S Ct 3275, 87 L Ed 2d 346 (1985) (Supreme Court examined remedial purpose of RICO, as well as its wording).

We hold that a plaintiff need not establish a conviction for predicate criminal conduct in order to allege "racketeering activity" under ORICO. The trial court erred in dismissing plaintiffs' claim on that ground; they allege conduct constituting crimes.

---

[11] That subsection has been renumbered as ORS 166.715(6).

■ Finally, defendants contend that plaintiffs' ORICO claim is deficient, because they do not plead a "threat of continuing activity." That omission, defendants argue, is fatal to the claim, even though plaintiffs' second amended complaint includes all of the express ORICO requirements for a "pattern of racketeering activity." ORS 166.715(4).[12] The question is whether "continuity" is a necessary element of ORICO's requirements for a pattern of racketeering activity. In arguing that it is, defendants rely solely on the holdings of federal cases, primarily *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 US 229, 109 S Ct 2893, 2902, 106 L Ed 2d 195 (1989), which defined "continuity" this way:

> " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. * * * It is, in either case, centrally a temporal concept * * *. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated. * * *
>
> "Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts in each case." (Emphasis in original; citations omitted.)

Defendants argue that plaintiffs were required, but failed, to allege either that the predicate acts extended over more than a few weeks or months, or that those acts "project into the future."

We begin our analysis with the statute itself. ORS 166.715(4) provides:

> " 'Pattern of racketeering activity' means engaging in at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing

---

[12] Defendants also argue that plaintiffs do not allege two or more incidents of racketeering. However, plaintiffs' second amended complaint includes allegations of multiple incidents.

characteristics, including a nexus to the same enterprise, and are not isolated incidents, provided at least one of such incidents occurred after November 1, 1981, and that the last of such incidents occurred within five years after a prior incident of racketeering conduct."

The use of the word "means" implies that the legislature intended the definition to be complete and self-contained.[13] That is, a plaintiff whose allegations track the express requirements of the definition, without doing more, would sufficiently allege a pattern of racketeering activity. However, ORICO does not define the phrase "not isolated." It is possible to construe "not isolated" as adding a temporal element beyond the express requirements of ORS 166.715(4). Therefore, we examine legislative history to assist us in determining the legislature's intent.

The legislative history is inconclusive, but the weight of it supports plaintiffs' position that "continuity" is not a separate required element of a pattern of racketeering activity under ORICO. Two pieces of the history hint that ORICO is meant to address long-term or future-oriented racketeering activity. First, in discussing the inclusion of civil forfeiture as a remedy for ORICO violations, a legislator who sponsored the bill said that forfeiture was aimed at the need to cut off the future activities of guilty defendants. Tape recording, Senate floor debates (SB 531), May 28, 1981, Tape 95A at 119-30, 231-40 (comments of Senator Wyers). Second, in committee testimony, a witness cautioned generally that ORICO could be too broad and that discretion would be required in its enforcement. Minutes, Senate Committee on Justice, May 18, 1981, p

---

[13] In *Sedima, S.P.R.L. v. Imrex Co.*, 473 US 479, 496 n 14, 105 S Ct 3275, 87 L Ed 2d 346 (1985), the Supreme Court of the United States considered the federal definition of "pattern of racketeering activity" and reasoned:

"[T]he definition of a 'pattern of racketeering activity' differs from the other provisions in [18 USC] § 1961 in that it states that a pattern *'requires* at least two acts of racketeering activity,' § 1961(5), not that it *'means'* two such acts. The implication is that while two acts are necessary, they may not be sufficient." (First emphasis original; second emphasis added.)

18 USC § 1961(5) simply "requires" two or more predicate acts, one of which occurred after the effective date of RICO and the last of which occurred within ten years after the commission of a prior predicate act. In contrast, ORS 166.715(4) is much more detailed. It not only states what "pattern of racketeering activity" "means," but also it includes a description of the element of relationship between or among the predicate acts. ORS 166.715(4) also differs from 18 USC § 1961(5) in requiring that the last predicate act occur within five years after a prior predicate act.

3. Neither of those comments was linked directly to the concept of "pattern of racketeering activity."

On the other hand, there are at least four clues that lead to an opposite conclusion. First, in none of the discussions that related specifically to the meaning of "pattern of racketeering activity" was the concept of continuity (long-term activity or future orientation) mentioned. Both in committee hearings and in floor debates, the participants stated that "pattern of racketeering activity" was defined by the statute; they referred only to the words of the statute to describe what a pattern is. Tape recording, Senate floor debates (SB 531), May 28, 1981, Tape 95A at 199-210; Minutes, Senate Committee on Justice, May 18, 1981, p 3; Tape recording, House Judiciary Committee, July 8, 1981, Tape H 81 Jud 532 Side B at 159-62.

Second, in floor debates, legislators expressed the view that their first priority in enacting civil ORICO was to give relief to victims, to compensate those who had been harmed in the past. Tape recording, Senate floor debates (SB 531), May 28, 1981, Tape 95A at 165-72. That overriding purpose suggests that the statute defining "pattern of racketeering activity" should be "liberally construed"[14] in favor of plaintiffs and that the legislature's focus was on past harm, rather than on threats of future harm.

Third, the only express reference to time contradicts the notion that the predicate acts must occur over a period of months (or longer) or into the future. In committee, one witness said that the statute focused on the "relationship between this crime this day and this crime the next day. That is, this crime is part of a pattern." Minutes, Joint Subcommittee on Organized Crime, April 23, 1981, p 6.

Fourth, we have found no decision, from any jurisdiction, predating the enactment of ORICO that required a plaintiff to establish "continuity" in the sense that defendants use the term: predicate acts over an extended period or a threat of future racketeering activity. Defendants cite *United States v. Stofsky,* 409 F Supp 609 (SD NY 1973), *aff'd on other grounds*

---

[14] ORS 166.735(2) provides that ORICO "shall be liberally construed to effectuate its remedial purpose."

527 F2d 237 (2d Cir 1975), *cert den* 429 US 819 (1976). According to defendants, *Stofsky* held "that a RICO pattern necessarily includes * * * 'continuity' * * *." Although the word "continuity" appears once in the court's discussion of Congressional concerns, defendants read too much into *Stofsky*. The court in *Stofsky* was concerned, not with predicate acts that were too close together, but with predicate acts that were too far apart. Its holding related only to the "relationship" element, not to any "continuity" element:

> "The Court, however, agrees with the proposition * * * that the word 'pattern' should be construed as requiring more than accidental or unrelated instances of proscribed behavior. * * *
>
> "* * * * *
>
> "* * * This Court therefore construes the word 'pattern' as including a requirement that the racketeering acts must have been connected with each other by some common scheme, plan or motive so as to constitute a pattern and not simply a series of disconnected acts." 409 F Supp at 613-14.

Defendants do not argue that plaintiffs failed to plead the necessary "relationship" in this case.

We do not read the statute and its history to mean that a plaintiff must establish, in addition to the express elements in ORS 166.715(4), a temporal element of "continuity." Instead, we read the phrase "not isolated" to describe the relationship between or among the predicate acts, including their nexus to the same enterprise.[15] We also note, as did the Court of Appeals, that the federal definition construed in *H.J. Inc. v. Northwestern Bell Telephone Co., supra,* differs from the ORICO definition, in that it is not complete or self-contained. See note 13, above. That difference, along with the fact

[15] In *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 US 229, 109 S Ct 2892, 106 L Ed 2d 195 (1989), the Supreme Court of the United States discussed the element of relationship by referring to 18 USC § 3575(e), which appears, not in RICO, but in a different part of the Organized Crime Control Act of 1970, 18 USC § 3575 *et seq* (now partially repealed). That section contains a definition similar to ORICO's definition of "pattern of racketeering activity," ORS 166.715(4), including the phrase "not isolated." The Court read that language to require a relationship of the defendant's criminal acts to one another, but not to require continuity in the temporal sense. 492 US at 239-40. Rather, the Court added the continuity requirement because of the incomplete definition of "pattern" in RICO and because of RICO's legislative history. 492 US at 240-43.

that the decision in *H.J.* issued several years after the enactment of ORICO, makes the reasoning in *H.J.* unpersuasive in construing ORS 166.715(4).

We hold that "continuity" is not a required element of an ORICO claim. Plaintiffs alleged each of the express elements in ORS 166.715(4). That being so, the trial court erred in dismissing the ORICO claim for failure to allege a pattern of racketeering activity.[16]

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded for further proceedings consistent with this opinion.

---

[16] Defendants also argue that the ORICO claim lacks factual specificity in various ways. None of those assertions has merit.